[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 07, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-15456

_____

D.C. Docket No. 00-00101-CV-HLM-4

MARVIN L. FISHER, RANDY J. COSBY,
TOM A. CARDEN, PHILIP M. CAVENDER,
as mutual insurance company policyholders
acting for the benefit and on behalf
of State Mutual Insurance Co.,

                                                               Plaintiffs-Appellants,

    versus

STATE MUTUAL INSURANCE COMPANY,
NORTH AMERICAN FINANCIAL SERVICES, INC.,
DELOS H. YANCEY, JR.,
DELOS H. YANCEY, III,
RODNEY HALE, et al.,

                                                             Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(May 7, 2002)**

Before BARKETT and MARCUS, Circuit Judges, and HIGHSMITH,[*] District Judge.

BARKETT, Circuit Judge:

Marvin L. Fisher, Randy J. Cosby, Tom A. Carden, and Philip M. Cavender (for convenience, "Fisher") brought a shareholder derivative suit against State Mutual Insurance Company ("State Mutual"), North American Financial Services, Inc. ("North American"), State Mutual Directors Delos H. Yancey, Jr. and Delos H. Yancey III ("the Yanceys"), a shareholder of North American named Rodney Hale, and the corporate secretary of State Mutual, Ann Rogers (collectively, "Defendants"), alleging that Defendants engaged in improper self-dealing.[1] Specifically, Fisher alleged that, during their tenure with State Mutual, the Yanceys, along with Hale and Rogers, formed a separate shell company to which they sold one of State Mutual's principal assets at an unreasonably low price, generating a substantial loss for State Mutual and correlative profit for the shell company and the other defendants. The trial court granted summary judgment in

---

[*]Honorable Shelby Highsmith, U.S. District Judge for the Southern District of Florida, sitting by designation.

[1]Fisher also sued Clay C. Long as well as certain trusts apparently held for the benefit of Yancey, Jr.'s family, namely: the Cheryl Yancey Boone Accumulation Trust, the Caramor Trust, the Cynthia Yancey Lester Accumulation Trust, the Joanne Yancey Accumulation Trust, and the Delos H. Yancey, III Accumulation Trust. Long and the trusts were the ultimate recipients of the profits earned by North American on the Atlas sale and are parties to this lawsuit only because they currently hold the money sought by Fisher.

2

favor of the Defendants on the basis of Georgia's "safe harbor" law, O.G.C.A. § 14-2-862, which insulates certain self-interested transactions from judicial scrutiny. Fisher now appeals, and we affirm.

## BACKGROUND

Delos H. Yancey, Jr. and Delos H. Yancey III were, at times material to this case, directors of State Mutual. Ann Rogers was State Mutual's corporate secretary. In 1993, while working for State Mutual, they formed North American together with Rodney Hale, who was neither an officer nor a director of State Mutual.[2] The Yanceys and Hale served on North American's board of directors and Rogers served as its corporate secretary (thus, the Yanceys were simultaneously directors of both State Mutual and North American).

Prior to the formation of North American, State Mutual bought a company called Atlas Life Insurance Company ("Atlas") for $13.9 million. Approximately one year after the formation of North American, State Mutual decided to sell Atlas. Several months into the process, North American expressed an interest in purchasing Atlas, which it ultimately did for approximately $8.7 million.[3] State

---

[2]The testimony reflects that Hale had performed "strategic consulting" services for State Mutual prior to the events at issue. However, Hale was neither an officer nor a director of State Mutual.

[3]The record shows that State Mutual began contemplating the sale of Atlas in approximately January, 1995. Yancey, Jr. testified that North American did not form an interest

Mutual sustained a loss of $5.2 million on the sale. Two years later, North American re-sold Atlas for approximately $31.5 million, making a profit of approximately $22.6 million.

Fisher brought this derivative suit to recover North American's $22.6 million profit, alleging that State Mutual's sale of Atlas to North American was void as an interested transaction. The Defendants responded that the Yanceys had recused themselves from State Mutual's decision to sell Atlas to North American, and, in so doing, had complied with the relevant provisions of Georgia's safe harbor law such that the transaction was valid and immune to judicial review.

In granting summary judgment for the Defendants, the district court found the following facts to be undisputed: In 1995, State Mutual decided to sell a subsidiary called Home Federal, which was expected to generate a significant tax liability. In order to offset this liability, State Mutual considered the possibility of selling Atlas, which was expected to generate a tax loss. Several months into the process, North American formed an interest in purchasing Atlas. Prior to North American's engaging in any negotiations with State Mutual, however, the Yanceys disclosed to State Mutual's Board of Directors their affiliation with North American and their resulting conflict of interest. Thereafter, the Yanceys abstained

in purchasing Atlas until late April or early May of that year.

4

from any proceedings or negotiations regarding the proposed Atlas transaction.

Following the Yanceys' notice, State Mutual's Board of Directors formed a Special Committee consisting of three disinterested directors to review, evaluate, and negotiate the Atlas transaction. The Board authorized the Special Committee "to retain such advisors as it deems necessary to assist it in determining the value of Atlas, the fairness of the proposed transaction, and compliance with all legal requirements applicable to the proposed transaction." Accordingly, the Committee retained Larry Warnock, an actuarial consultant, Peter Mattingly, an investment banker, and James L. Smith III, an attorney, to assist with the valuation of Atlas, and to provide financial and legal advice regarding the potential transaction. Based upon the report of the retained experts, the Special Committee negotiated a sale of Atlas to North American for $8.7 million, which the full State Mutual Board approved. The Yanceys recused themselves from the Board's discussions and vote. In accordance with Georgia law, State Mutual then sought and received approval of the Atlas sale from the Georgia Insurance Commissioner.

Based on these facts, the district court held that the Yanceys had complied with the requirements of the Georgia safe harbor law. Therefore, the court held that the transaction was insulated from judicial review and granted summary judgment in favor of the Defendants. We review the district court's grant of

summary judgment de novo, viewing the record and drawing all inferences in favor of the non-moving party. See Arrington v. Cobb County, 139 F.3d 865, 871 (11th Cir. 1998).

**DISCUSSION**

Fisher first contends that the district court erred in finding that the Yanceys complied with the requirements of the safe harbor, O.C.G.A § 14-2-862, and therefore, that the Atlas transaction was immune to judicial review. Second, Fisher argues that the plain language of O.C.G.A § 14-2-861(b) only shields from judicial scrutiny transactions that are challenged "on the ground of an interest in the transaction of the director," whereas his complaint challenges the Atlas transaction on grounds other than "an interest in the transaction of the director," specifically, corporate waste, fraud, usurpation of corporate opportunity, and breach of fiduciary duty. We first consider the language of O.C.G.A § 14-2-861(b) and O.C.G.A § 14-2-862, which together constitute the safe harbor.

O.C.G.A § 14-2-861(b), provides in relevant part:

(b)   A director's conflicting interest transaction may not be enjoined, set aside, or give rise to an award of damages or other sanctions, in an action by a shareholder or by or in the right of the corporation, on the ground of an interest in the transaction of the director or any person with whom or which he has a personal, economic, or other association, if:

(1)   Directors' action respecting the transaction was at any time

6

taken in compliance with Code Section 14-2-862;

\*\*\*; or

(3)    The transaction, judged in the circumstances at the time of commitment, is established to have been fair to the corporation.

Id. (emphases added).

O.G.C.A. § 14-2-862, in turn, provides:

(a)    Directors' action respecting a transaction is effective for purposes of paragraph (1) of subsection (b) of Code Section 14-2-861 if the transaction received the affirmative vote of a majority (but not less than two) of those qualified directors on the board of directors or on a duly empowered committee thereof who voted on the transaction after either required disclosure to them (to the extent the information was not known by them) or compliance with subsection (b) of this Code section.

(b)    If a director has a conflicting interest respecting a transaction, but neither he nor a related person of the director specified in subparagraph (a) of paragraph (3) of Code Section 14-2-860 is a party thereto, and if the director has a duty under law or a professional cannon, or a duty of confidentiality to another person, respecting information relating to the transaction such that the director cannot, consistent with that duty, make the disclosure contemplated by Subparagraph (B) of paragraph (4) of Code Section 14-2-860 [required disclosure], then disclosure is sufficient for purposes of subsection (a) of this Code section if the director:

(1)    Discloses to the directors voting on the transaction the existence and nature of his conflicting interest and informs them of the character of and limitations imposed by that duty prior to their vote on the transactions; and

(2)    Plays no part, directly or indirectly in their deliberations or vote.

7

Id.

Under these provisions, the Yanceys were required either (a) to disclose to State Mutual any and all knowledge that they may have had regarding the Atlas transaction as a result of their affiliation with North American, or, (b) if they had a conflicting fiduciary duty to North American, to advise State Mutual's disinterested directors of the existence and nature of their conflicting interest (and the character of, and limitations imposed upon them by, that conflicting interest), and then to refrain from playing any part, directly or indirectly, in State Mutual's deliberations and vote on the Atlas sale.

The district court accepted the Defendants' contentions that § 14-2-862(a) was inapplicable because they had a fiduciary duty to North American, and, therefore, that they had to comply with the safe harbor by giving notice to State Mutual of their conflicting interest and abstaining from participating in the Atlas transaction, on behalf of State Mutual, thereafter. The court then held that Defendants had complied with O.G.C.A. § 14-2-862 (b) (1) and (2) by advising the disinterested directors of State Mutual that they were directors of North American and recusing themselves from direct or indirect participation in State Mutual's decision to sell Atlas to North American.[4] Fisher contends that the Yanceys should

---

[4]The Defendants do not concede that subsection O.G.C.A. § 14-2-861 (3), which immunizes transactions from judicial review if "the transaction, judged in the circumstances at

have complied with § 14-2-862(a) because they did not <u>actually</u> have a fiduciary duty to North American that prevented them from making any disclosures required by O.G.C.A. § 14-2-862(a); they merely had a "fabricated" fiduciary duty which they themselves created (by forming North American) for the sole purpose of "getting around" the disclosure requirement.  Alternatively, Fisher argues, even assuming the Yanceys did have a genuine fiduciary duty to North American, the district court erred in finding that the Yanceys abstained from direct or indirect participation in the proceedings because, Fisher claims, the Yanceys "orchestrated" the entire Atlas sale from behind the scenes.

With respect to his first claim, Fisher argues that the Yanceys were under no "real" duty to North American because North American (1) "had no confidential information or competitive secrets"; (2) "conducted no business prior to its acquisition of Atlas Life"; and (3) was a "mere shell corporation."  We find that none of these characteristics demonstrates that the Yanceys did not owe a fiduciary duty to North American.  Georgia law clearly establishes, without exception, that as directors of North American, the Yanceys owed duties of confidentiality and loyalty to that company irrespective of its specific characteristics or history.  <u>See</u>

the time of commitment, is established to have been fair to the corporation," is inapplicable to them.  Rather, they argue that it was unnecessary to demonstrate fairness under O.G.C.A. § 14-2-861 (3) because their undisputed proof showed compliance with subsection (1), which allowed for safe harbor compliance through notice and non-participation.

9

O.C.G.A. § 14-2-830; Quinn v. Cardiovascular Physicians, P.C., 254 Ga. 216, 217, 326 S.E.2d 460, 463 (Ga. 1985) ("It is settled law that corporate officers and directors occupy a fiduciary relationship to the corporation and its shareholders, and are held to the standard of utmost good faith and loyalty."). Accordingly, the commentary to the alternative disclosure provision of § 14-2-862(b) specifically recognizes that "[t]he most frequent use of subsection (b) . . . will undoubtedly be in connection with common directors who find themselves in a position of dual fiduciary obligations that clash." See O.C.G.A. § 14-2-862, cmt. Fisher has not pointed to anything in Georgia law that establishes an exception to the normal fiduciary rule for "shell corporations" or corporations that have not transacted business prior to the occasion in question. Instead, the safe harbor unambiguously provides that if a director has a fiduciary duty to another corporation, he or she may comply with that provision through the notice-plus-non-participation procedures of O.C.G.A. § 14-2-862(b). The only exception listed by the statute exists where the director himself or a "related person" is actually a party to the transaction, and it is undisputed that the exception does not apply here because none of the individual defendants was a party to the Atlas sale, which was between State Mutual and North American.[5] In any event, the Yanceys testified in

_____

[5]O.G.C.A. § 14-2-860(3) specifically defines the category of "related persons." Though Fisher attempts to characterize North American itself as a "related person" (because in his view,

10

their depositions that they do not recall any facts concerning Atlas that they could have disclosed to State Mutual, but did not, and Fisher has not produced any evidence to the contrary.

In sum, because Georgia law clearly establishes that the Yanceys, as directors of a bona fide corporation (i.e., North American), were subject to a fiduciary duty that conflicted with their duty to State Mutual, the district court did not err in holding that Defendants were obligated to comply with the safe harbor by giving notice of their conflicting interest and abstaining thereafter from all participation on behalf of State Mutual in the Atlas transaction.

Because it is undisputed that the Yanceys notified State Mutual of their conflict of interest, we turn to Fisher's argument that the Yanceys failed to comply with § 14-2-862(b)(1) and (2) because they did not in fact abstain from all participation in the Atlas transaction, but rather "orchestrated" it behind the scenes. We must reject this contention because there is insufficient record evidence to support it. Fisher asserts that the evidence of direct involvement can first be found in Yancey, Jr.'s participation in choosing the members of the Special Committee. Although Yancey, Jr. did chair the May 8, 1995 meeting at which three

---

it is just a shell corporation for the Yanceys), the company does not fall within the defined category.

11

disinterested directors were selected to constitute the Special Committee, and may have cast a vote selecting them, there is no indication that he exerted any improper or special influence over this selection. First, the minutes do not list the individual votes of directors, stating only that the three Special Committee members had been approved. Nor do the minutes specifically indicate that Yancey, Jr. abstained from the vote. Thus, it is not clear whether Yancey, Jr. participated or not. Regardless, Georgia does not require that a corporate special committee be selected wholly by disinterested directors. See 2 Model Bus. Corp. Act. (3d ed. 1985), 8-488 ("Georgia has adopted 8.62 with the exception that it does not require the members of a committee to be qualified directors or appointed by qualified directors."). Thus, Yancey, Jr.'s vote does not affect the applicability of O.G.C.A. § 14-2-862(b)(2).

Next Fisher claims that Yancey, Jr. participated in Special Committee meetings on June 1 and 9, 1995. However, the Committee notes show that Yancey, Jr. participated in these meetings as a representative of North American. Having tendered the required notice to State Mutual under the safe harbor law, Yancey, Jr. was legally entitled to do this, and to negotiate against the State Mutual Special Committee. As Defendants point out, this is the very purpose of the Safe Harbor law, and it is not this Court's function to question its wisdom or efficacy.

12

Fisher also contends that Yancey, Jr. participated in State Mutual Board meetings that occurred on June 9 and 12, 1995, the latter of which included the final vote by the full State Mutual Board (excluding the Yanceys) approving the Atlas sale. The record reflects that although Yancey, Jr. did attend these meetings, his participation was limited to calling the meetings to order, and then asking Special Committee member Charles Braun to take over as Chairman. While Yancey, Jr. remained present during the meetings, nothing in the minutes reveals that he participated in any manner. In fact, the minutes specifically indicate that, along with Yancey III, Yancey, Jr. left the June 9 and 12 meetings to allow discussion of the Atlas sale by the disinterested members of the State Mutual Board and to allow the qualified Board members to vote on resolutions finally approving the transaction.

Finally, Fisher contends that the Yancey, Jr. and Hale "hand picked" the independent advisers retained by the Special Committee to evaluate the proposed transaction. First, we note that Hale was not an officer or director of State Mutual, and thus, did not have any obligation to State Mutual. Second, we find no error in the district court's determination that the evidence is insufficient to support Fisher's contention. With regard to Peter Mattingly, Fisher submits evidence consisting of two letters between Mattingly and Hale. The first letter is a draft

13

engagement letter sent from Mattingly to Hale in January 1995, before North American expressed an interest to State Mutual in buying Atlas. The letter sets out terms and conditions under which State Mutual would retain Mattingly to provide an opinion regarding Atlas' fair sale price. The second letter is virtually identical to the first, only it is dated May 2, 1995. The letters are each covered with identical notes stating "Attached is a [revised] draft engagement letter covering the various points we discussed." Although these letters certainly raise questions, we cannot say that the district court erred in concluding that the letters, standing alone, do not suffice to support Fisher's contention. Ultimately, it was the Special Committee, and not Hale, that voted to retain Mattingly. Committee member S. David Smith testified that while the Committee was aware that Mattingly had done work for Hale in the past, the Committee independently reviewed Mattingly's credentials and chose to hire him.

Fisher relies on two similar letters between Larry Warnock and Hale, which like the Mattingly letters, raise questions as to Hale's involvement. However, like Mattingly, Warnock was ultimately retained by the Special Committee, which independently reviewed his credentials and chose to hire him. Further, the record also shows that Warnock had worked for State Mutual prior to the Atlas transaction and thus had a preexisting relationship with the company.

In sum, while Yancey, Jr. and Hale's involvement in hiring the experts ultimately retained by the Special Committee is somewhat troubling, Fisher has simply not produced sufficient evidence to show that the Yanceys were directly or indirectly involved in the Atlas transaction such that the transaction should be deprived of its statutory immunity. Even viewing the facts in the light most favorable to Fisher, therefore, we cannot conclude that he adduced sufficient evidence to overcome summary judgment on this basis.

Finally, Fisher argues alternatively that even if the Defendants complied with the requirements of the safe harbor law, his complaint is not barred because, in addition to challenging the Atlas transaction on the basis of the Yanceys' self-interest, the complaint alleges corporate waste, fraud, breach of fiduciary duty, and usurpation of corporate opportunity, and such claims are not barred by the safe harbor. However, these allegations are not independent of Fisher's essential claim of self-dealing, but are totally interrelated. See Gaudet v. United States, 517 F.2d 1034, 1035 (5th Cir. 1975) ("It is the substance of the claim and not the language used in stating it which controls.").[6] Fisher's complaint includes four counts, respectively entitled "Self-Dealing Mismanagement," "Breach of Duty of Good

---

[6]In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

15

Faith," "Conspiracy," and "Constructive Trust." The complaint does mention

fraud, waste, mismanagement, and usurpation of corporate opportunity. However,

it does so only in the context of detailing the <u>nature</u> of Defendants' alleged self-

dealing, which is the essence of Fisher's claims for relief. In this regard, we note

that Fisher has sued only State Mutual itself, North American, the Yanceys,

Rogers, and Hale, and <u>not</u> the disinterested members of State Mutual's Board of

Directors who actually voted on the Atlas sale.[7] Simply put, the Yanceys did not

vote on the sale of Atlas, Hale and Rogers were not members of the State Mutual

Board, and North American, obviously, is a separate company.

With regard to Fisher's claim that the complaint alleged "usurpation of a

corporate opportunity," we note that the facts of this case preclude such an

allegation. Under Georgia law, the paradigmatic "usurpation of a corporate

opportunity" claim arises when a corporate director or officer is presented with a

business opportunity that could benefit the corporation, but the director conceals

the opportunity from the corporation in order to avail himself of it personally. <u>See</u>

<u>Instrument Repair Serv., Inc. v. Gunby</u>, 238 Ga. App. 138, 141, 518 S.E.2d 161,

164 (Ga. Ct. App. 1999) (summary judgment is appropriate where the director

---

[7]As noted above, Fisher also sued Clay Long and the trust recipients of North American's profit from the Atlas sale. However, because those defendants are parties to this suit only because they now hold the money Fisher seeks, they are not material to this discussion.

16

presents an opportunity to his corporation, which the corporation expressly declines). It is undisputed that State Mutual's Board knew of the Atlas sale and had a full opportunity to evaluate the proposed transaction. In such circumstances, a "usurpation" claim is simply not available. In this regard, we note that Fisher's complaint does not make any reference to O.C.G.A. § 14-2-831(a)(1)(c), which authorizes shareholders to bring a derivative action against directors to seek relief for "[t]he appropriation, in violation of his duties, of any business opportunity of the corporation," and which has been recognized by the Georgia courts as the only basis for a "usurpation" claim . See Southeast Consultants, Inc. v. McCrary Eng'g Corp., 246 Ga. 503, 506 n.1, 273 S.E.2d 112, 115 n.1 (Ga. 1980).

The simple fact is, regardless of how Fisher now seeks to characterize his cause of action, the entire complaint in this case is premised on the allegation that the Atlas sale was tainted by the Yanceys' dual roles as directors of both State Mutual and North American. In substance, therefore, the complaint seeks damages on a theory of self-dealing and therefore falls within the purview of the safe harbor law. The district court correctly determined that Fisher's lawsuit is barred.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of the Defendants is

17

**AFFIRMED.**