**APA EXCELSIOR III, L.P.,
et al., Plaintiffs,**

v.

**Rodney D. WINDLEY,
et al., Defendants.**

**No. CIV. 1:01–CV–3126–RWS.**

United States District Court,
N.D. Georgia,
Atlanta Division.

July 27, 2004.

Jonathan Terry McCants, Bird & Loechl, Richard L. Brittain, Bird & Loechl, Wendell R. Bird, Bird & Loechl, Atlanta, GA, William Terrence Casey, Jr., Hicks Casey & Barber, Marietta, GA, for APA Excelsior III L.P., Plaintiff.

Alison Danaceau, Paul Hastings Janofsky & Walker, Carl Wilson Mullis, III, Paul Hastings Janofsky & Walker, Cecil Francis Whitaker, III, Paul Hastings Janofsky & Walker, James Allen Maines,

Paul Hastings Janofsky & Walker, Michael D. Grider, Paul Hastings Janofsky & Walker, Atlanta, GA, for Rodney D. Windley, Defendant.

### ORDER

STORY, District Judge.

Plaintiffs, shareholders in one of the Defendant corporations, brought this action alleging that they were wrongfully frozen out in connection with a transfer and acquisition of corporate assets. Plaintiffs are the following investment funds: APA Excelsior III, L.P., APA Excelsior III/Offshore, L.P., APA/Fostin Pennsylvania Venture Capital Fund, L.P., and Landmark Equity Partners V, L.P. (collectively referred to as the "Patricof Plaintiffs"); Humana, Inc. ("Humana"); and Fostin Capital Associates II LP ("Fostin Capital"). Defendant Healthfield, Inc. ("HFI") is a corporation providing home healthcare services that was founded in 1986 by Defendant Rod Windley. Plaintiffs were investors in HFI. In November 1996, HFI became a wholly-owned subsidiary of Defendant Healthfield Holdings, Inc. ("HHI").[1] In exchange for new financing, HHI gave a security interest in all of HFI's assets, including its stock, to Finova Capital Corporation ("Finova") in 1998.[2] After sending numerous notices of default, Finova commenced foreclosure proceedings against HHI in early 2001. Finova foreclosed on HHI's assets and held a public foreclosure auction on March 9, 2001. Defendants Four Seasons Healthcare, Inc. ("FSHI"), and Four Seasons Healthcare, LLC ("FSHLLC") (collectively, "Four Seasons"), which are owned by Windley, purchased HHI's assets at the auction.

Now before the Court for consideration are: Defendants' Motion for Summary Judgment [81–1] and Oral Argument [81–2]; Plaintiff APA's Motion for Summary Judgment on Counterclaim [84–1]; Plaintiff Humana's Motion for Summary Judgment on Federal Securities Claim [85–1]; Plaintiff Fostin Capital's Motion for Summary Judgment on Non–Securities Claims [89–1]; Defendant's Motion to Strike and to Disregard and Exclude Unauthenticated Documents [116–1]; Defendant's Motion to Disregard and Exclude Certain Inadmissible Documents [121–2]; Plaintiffs' Motion to Enforce July 22 Order [138–1]; and Plaintiffs' Motion for Permission to Name Expert Witnesses [138–2]. Having considered the record and the parties' briefs, the Court enters the following Order.

As an initial matter, the Court finds that the parties' briefs and exhibits are sufficient to enable the Court to rule on the pending motions; accordingly, Defendants's Motion for Oral Argument [81–2] is hereby DENIED. The Court turns to a number of outstanding evidentiary issues before considering the parties' motions for summary judgment.

### I. Evidentiary Issues

#### A. Defendants' Motions to Disregard and Exclude Certain Evidence

Defendants raise objections to Plaintiffs' evidence attached to the affidavits of Collette Adams and Patti Stanley. In an Order entered March 31, 2004, the Court rejected Defendants' motions to strike the affidavits, but nevertheless concluded the affidavits were insufficient to authenticate the documents attached thereto. The Court reserved ruling on Defendants' other evidentiary objections. Those objec-

---

**1.** The Court refers to HFI and HHI collectively as "the Companies."

**2.** Finova is not a party in this case.

tions are now before the Court for consideration.

Attached to Collette Adams' affidavit are forty-five documents. With respect to most of those documents, Defendants concede that they can be authenticated by deposition testimony. However, Defendants specifically challenge six documents that they contend cannot be authenticated by any record evidence and contain hearsay: Plaintiffs' Exhibits 57, 58, 59, 60, 61, and 69.[3] These six documents were produced in response to a non-party subpoena by a financial firm named Kugman & Associates ("Kugman").

■ In ruling on a motion for summary judgment, a court may consider only evidence that would be admissible at trial. *White v. Wells Fargo Guard Servs.*, 908 F.Supp. 1570, 1577 (M.D.Ala.1995). However, evidence produced for summary judgment need not be in an admissible form if it could be reducible to admissible form for trial. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1444 (11th Cir.1991).

■ Generally, documents must be properly authenticated in order for them to be considered on summary judgment. *Burnett v. Stagner Hotel Courts, Inc.*, 821 F.Supp. 678, 683 (N.D.Ga.1993). Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "To meet this standard, the proponent need only demonstrate a rational basis for its claim that the evidence is what the proponent asserts it to be." *United States v. Coohey*, 11 F.3d 97, 99 (8th Cir.1993). Thus, courts may look to other evidence in the case to determine whether a chal-

lenged document meets the standard of Rule 901. *See, e.g., Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253, 1259 (11th Cir.1983) (examining other evidence and determining document was properly admitted under Rule 901).

With the exception of an invoice (Pls.' Ex. 60), the documents here all purport to be correspondence, or drafts of correspondence, prepared at Kugman to be conveyed to Defendants or Finova. Defendants contend these documents were never identified by their authors, recipients, or custodians in depositions. Plaintiff responds, however, that these documents were produced in response to a subpoena that requested "any and all documents which in any way relate to the foreclosure sale of Healthfield, Inc.... and all correspondence with any person employed at or representing Healthfield, Inc. or Four Seasons Healthcare, Inc. from January 1, 2000 through August 31, 2001." Kugman's general counsel stipulated that all documents produced by Kugman were accurate copies responsive to the subpoena. Moreover, he stipulated that the firm did not have a records custodian, but that he had contacted the parties necessary to ensure that Kugman properly responded to the subpoena.

■ The Court has reviewed all of the six challenged documents. They fall within the relevant timeframe specified in the subpoena and are consistent with the undisputed facts showing there was some negotiation between Windley, Finova, and Kugman prior to the foreclosure. Moreover, based on deposition testimony regarding these documents, the Court concludes that they have been sufficiently identified and connected to the circumstances of this case to provide a basis for being considered in connection with the

---

**3.** Plaintiffs' Exhibit 59 was also Exhibit 2 to Abrahams' deposition.

pending motions for summary judgment. (*See, e.g.,* Kugman Dep. at 81–83 (discussing "Four Seasons Healthcare Proposal" referenced in Pls.' Ex. 57); *id.* at 87–88 (testifying with respect to Pls.' Ex. 58, "[i]t's a letter I prepared that is addressed to Michael Keller and Randy Abrahams at Finova.");[4] *id.* at 104–05 (stating Pls.' Ex. 60, an invoice, appeared to have been prepared by Kugman firm); *id.* at 111–12 (stating, with respect to Pls.' Ex. 61, "I would guess that I did send the letter"); *id.* at 130–31 (testifying to circumstances referenced in Pls.' Ex. 69); Abrahams Dep. at 109–111, 121 (connecting Pls.' Ex. 59 with circumstances of case).)

Defendants also argue that these documents are offered for the truth of the matter asserted and are therefore hearsay; they contend that the business records exception in Federal Rule of Evidence 803(6) is inapplicable here. Plaintiffs respond that these documents are not hearsay because the statements in them were made by Defendants' agent, Kugman. Plaintiffs further emphasize that Kugman was authorized to speak on Defendants' behalf at the time the challenged exhibits were written.

The Court need not decide whether Kugman was acting as Defendants' agent because it finds that the documents are not offered for the truth of the matter asserted. *See* Fed.R.Evid. 801(c) (defining hearsay). Instead, the documents are offered to show such things as knowledge, state of mind, and prior planning. Accordingly, Defendants' Motion to Strike Affidavit of Collette Adams and to Disregard and Exclude Unauthenticated Documents [116–1] is hereby **DENIED in part.**[5]

In Defendants' Motion to Disregard and Exclude Certain Inadmissible Documents [121–2], Defendants challenge the following additional documents attached to Patti Stanley's affidavit: Plaintiffs' Exhibits 39, 59, 62, 70, 71, 72, 73, 75, 76, 77, 78, 81, 82, 83, 84, 85, 86, 90, and 91. It has not been necessary for the Court to consider these objections to reach its conclusions at summary judgment. At trial, Defendants may renew any objections to evidence that has not been discussed herein. Thus, Defendant's Motion to Disregard and Exclude Certain Inadmissible Documents [121–2] is hereby **DENIED without prejudice.**

**B. Plaintiffs' Motion to Enforce and for Permission to Name Expert Witness**

**1. Motion to Enforce**

Plaintiffs contend that Defendants failed to comply with the Court's Order entered July 23, 2003, regarding the production of financial documents. That Order gave Defendants five days within which to produce to Plaintiffs any audited and unaudited financial statements of FSHI as may exist for January 1, 2000 through April 25, 2003. According to Plaintiffs, Defendants waited six weeks and then produced only a single document titled "Four Seasons Healthcare, Inc. and Subsidiaries Consolidated Financial Statements December 31, 2002 and 2001 (With Independent Auditors' Report Thereon)." (The "September 2003 document") (Pls.' Mot. to Enforce Ex. 2.) Yet Plaintiffs contend that Defendants have regularly provided many third parties with various financial documents they now claim do not exist.

Defendants respond that they had already produced the financial statements

---

4. Randy Abrahams was Windley's primary contact at Finova.

5. By an Order entered March 31, 2004, this Court denied the Motion in part to the extent

it sought to strike the affidavit of Collette Adams. With the ruling herein, the Motion is denied in full and is no longer pending.

required by this Court's Order prior to its entry date. Moreover, they contend that the document produced six weeks following the July 23, 2003 Order was created after the close of discovery and more than five days after the Order. Thus, that document was not contemplated by Plaintiffs' discovery requests or the Court's Order. Finally, Defendants admit that they have other financial records, such as computer files, but they contend that Plaintiffs did not timely move to compel those records.

Although the Court stated that monthly, annual, and quarterly statements should be produced, it also noted that Defendants' contention that there were no quarterly statements was undisputed. (Order of July 23, 2003 at 2.) Moreover, contrary to Plaintiffs' assertion, the Order did not require Defendants to turn over drafts of financial statements. Plaintiffs' Motion to Compel [67–1] did not raise the issue of drafts, nor do drafts appear to be at issue in the language of their Interrogatory No. 15 or Request for Production No. 12, both of which were reprinted in Plaintiffs' Motion to Compel. Even if Plaintiffs' original discovery requests were broader, additional types of documents, such as drafts, are beyond the scope of the July 23, 2003 Order which Plaintiffs move to enforce.

Defendants have produced evidence showing their compliance with the July 23, 2003 Order. In the now-pending Motion, Plaintiffs seek to obtain documents that were beyond the scope of that Order. Accordingly, Plaintiffs' Motion to Enforce [138–1] is hereby **DENIED.**

**2. Permission to Name Expert Witness**

Plaintiffs contend that the September 2003 document reveals that Defendants have "cooked their books," giving rise to Plaintiffs' need for two expert witnesses. Plaintiffs contend that they need one expert to evaluate Defendants' computers and any backup documents, and to determine whether any files have been destroyed. They argue that the second expert can then determine why FSHI's income as reported in the September 2003 document increased over the financial statements that Defendants previously produced, and can assist in determining the value of FSHI. Finally, Plaintiffs state that these discrepancies did not become evident until after the close of discovery, when Defendants delivered their 2001 audited financial statements (in May 2003) and then the 2002 audited financial statements (in September 2003).

Defendants respond that Plaintiffs should not be able to obtain additional discovery through an expert who would search computer files. With respect to both experts, Defendants contend that Plaintiffs failed to name any experts during the discovery period. Finally, Defendants explain that the changes in numbers from the discovery documents to the September 4, 2003 document simply reflect adjustments made following FSHI's 2002 audit.

The Court concludes that Plaintiffs are not entitled to name expert witnesses at this late date. As for the computer expert, the Court will not allow Plaintiffs to do indirectly what they cannot do directly—that is, obtain other financial records after the close of discovery. As for the valuation expert, the Local Rules provide that experts who will be used at trial must be designated "sufficiently early in the discovery period" to permit appropriate depositions. N.D. Ga. Local R. 26.2(C). Moreover, "[a]ny party who does not comply with the provisions of the foregoing paragraph shall not be permitted to offer the testimony of the party's expert, unless expressly authorized by court order based upon a showing that the failure to comply

was justified." *Id.* The Court finds that Plaintiffs' failure to comply in this case was not justified. Plaintiffs premise their argument on this being a case involving complex financial transactions, but it was readily apparent during discovery that complex financial transactions would be at issue. The need for an expert should have been apparent during discovery. Although Defendants made certain productions following the close of discovery, Plaintiffs have failed to show evidence of the blatant "cooking of books" they allege.

Based on all the foregoing, the naming of experts is not justified. Accordingly, Plaintiffs' Motion for Permission to Name Expert Witnesses [138–2] is hereby **DENIED.**

## II. Motions for Summary Judgment

Defendants have moved for summary judgment on all of Plaintiffs' claims. Plaintiff Fostin Capital has moved for summary judgment on certain of the non-securities claims, stating that all parties join in the brief and motion. Plaintiff APA Excelsior III, LC has moved for summary judgment on Defendants' counterclaim, stating that all parties join in the brief and motion. Finally, Plaintiff Humana moves for summary judgment on the federal securities claims, stating that all parties join in the brief and motion.[6]

## Factual Background

The following facts are undisputed except as otherwise described.

### A. The History of HFI and HHI

As noted above, Windley founded HFI in 1986. Plaintiffs became involved with the company when they purchased $8 million of stock in HFI in 1992.[7] This transaction was governed by a "1992 Securities Purchase Agreement." (*See* Defs.' Ex. CC).[8] In November 1996, HFI became a wholly-owned subsidiary of HHI by virtue of a Merger Agreement. (Defs.' Ex. AA.) As a result, Plaintiffs' shares in HFI were voluntarily converted to shares in HHI. (*Id.* ¶ 4.1.) The stock in HFI was the only asset of HHI. Subsequently, Plaintiffs invested approximately an additional $1 million in the Companies.

By 1998, Plaintiffs held several positions on the HHI Board of Directors. The Patricof Plaintiffs' representative on the Board was George Jenkins, an individual who had familiarity and expertise in in-

---

**6.** With respect to Humana's and Fostin Capital's Motions, the Court is concerned that the Plaintiffs appear to have attempted to evade the page limits for briefs set forth in the Local Rules. All plaintiffs are represented by the same counsel. All the plaintiffs join in each brief and each brief covers a portion of the claims alleged in the Complaint. The Court can identify no basis for differentiating between the different Plaintiffs for the different claims. It therefore appears that all of the claims on which Plaintiffs move for summary judgment should have been addressed in a single motion and single brief. The Local Rules provide that, should a party fail to comply with the form limitations set forth therein, the court may decline to consider any motion or brief that so fails to comply. N.D. Ga. Local R. 7.1(F). Although the Court considers the Plaintiffs' Motions and briefs at this time, Plaintiffs are admonished that they must

abide by the letter *and* spirit of the Rules of this Court in the future.

**7.** Although Plaintiffs describe themselves as "Minority Shareholders," this term may be misleading because there is uncontroverted evidence that: (1) Windley himself was a minority shareholder at the time of the foreclosure; and (2) Plaintiffs had the ability to exercise supermajority control with respect to HHI. (Robbins Dep. at 95–96; Windley Aff. (Defs.' Ex. D) ¶ 4.)

**8.** Defendants' Exhibits are located in appendices, where they are denoted by letters; and in bound volumes, where they are denoted by numbers. Plaintiffs' Exhibits are located in bound volumes, where they are denoted by numbers.

vesting. Humana's representative on the Board was George Emont, another individual with familiarity and expertise in investing. Fostin Capital's representative on the Board was Thomas Levine, a knowledgeable businessman with familiarity and expertise in investing.

During that time, Plaintiffs believed that Windley was doing an inadequate job as President and CEO of the Companies. (Jenkins Dep. (Ex. M) at 127–28; Emont Dep. (Ex. H) at 164–65; Beckman Dep. (Ex. G) at 146–52;[9] Defs.' Exs. KK (draft investment thesis describing HHI's history of poor management and replacement of CEO), LL (similar description in transaction summary), MM (same in investment thesis).) Plaintiffs' representatives on the Board testified in their depositions that they did not trust Windley. For example, Emont testified that he did not trust Windley beginning sometime between 1997 and 1999 and he believed at that time that Windley lied to him. (Emont Dep. (Defs.' Ex. H) at 155–56.) Similarly, Jenkins stated that he would not believe Windley under oath because Windley had misled Jenkins many times. (Jenkins Dep. (Defs.' Ex. L) at 269.) Levine testified that over a period of time from the late 1990's to the present, Levine developed an increasing concern about whether Windley was truthful and forthcoming to his investors. (Levine Dep. (Defs.' Ex. O) at 146–48.) As a result of these concerns, Tom Robbins became the Companies' President and CEO on about November 30, 1998. Windley remained the Chairman of the Board.

The Companies experienced financial difficulty beginning in at least 1998. As a result, HHI sought and obtained new financing from Finova in 1998. As part of this agreement, in which Plaintiffs participated, HHI pledged the stock in HFI as collateral for the loan and gave Finova a right to foreclose in the event of default. (Jenkins Dep. (Ex. L) at 185; Defs.' Ex. VV; Defs.' Ex. XX; Defs.' Ex. YY.) To secure the Finova financing, Windley was required to loan $2 million to HHI and to personally guarantee approximately $2 million of the Finova loan. (Strange Dep. (Ex. S) at 218; Defs.' Ex. UU (promissory note from HHI to Windley for $2 million); Windley Dep. (Ex. T) at 125.)

Even after obtaining the new Finova loan, the Companies struggled financially. Although the parties dispute the degree to which the Companies were in poor financial condition, they agree that on March 31, 1999, Finova sent HHI what would be the first of several notices of default. (Defs.' Ex. BB.) Among the reasons for default were an overadvance of approximately $1.6 million and a net worth of less than negative $5.5 million. (*Id.* Schedule I.) According to Cynthia Lumpkin, who was the Chief Financial Officer of the Companies beginning in early 2000, HHI's liabilities exceeded its assets by approximately $20 million in early 2001. (Lumpkin Aff. (Defs.' Ex. C) ¶ 4.) Moreover, Plaintiffs had written down the value of their investment in HHI, though they did so "on a conservative basis." (Levine Dep. (Ex. O) at 96; *see also* Defs.' Ex. PP; Emont Dep. (Ex. H) at 126–28; Patricof Dep. (Ex. Q) at 56–58.) Further, Windley personally loaned money to the companies to cover certain expenses such as payroll and payroll taxes.[10] (Lumpkin Dep. (Defs.'

---

**9.** Charles Beckman was Humana's director of venture capital beginning in mid–1999.

**10.** It appears that at least some of these loans were either undocumented, or documentation no longer exists. (*But see* Defs.' Ex. U (including 1997 promissory note).) Further, some of the loans may have been paid off. (Lumpkin Dep. (Defs.' Ex. P) at 137.) When an outside firm, the Halifax Group, issued a Letter of Intent to invest in the Companies and conducted due diligence, no documenta-

Ex. P) at 135–37.) According to Defendants, by February 2001, the total of the loans and interest owed to Windley by HHI and HFI was in excess of $3 million. (*Id.* at 133; Defs.' Ex. U (including various tabulations of amounts owed to Windley); Lumpkin Aff. (Defs.' Ex. C) ¶ 9.)

In June 2000, Finova sent a demand letter to HHI that emphasized the events of default and HHI's poor financial condition, and contemplated a meeting between Finova and HHI. (Defs.' Ex. II.) Shortly thereafter, Finova and HHI's management held a meeting in Scottsdale, Arizona. During that meeting, Finova indicated that HHI needed to find a buyer for HFI, or other financing; Finova also indicated that it was actively considering foreclosing on its loan.[11],[12] (Hughes Dep. (Defs.' Ex. K) at 185–86.)

Needing alternatives to foreclosure, HHI solicited various proposals for recapitalizing and/or selling the Companies. One of these proposals took the form of a Letter of Intent from Westar Capital ("Westar"). (Compl. Ex. 1; Robbins Dep. (Defs.' Ex. R) at 262–64.) The proposal in Westar's Letter of Intent would have given Westar equity in HHI, but would have left the existing shareholders, including Plaintiffs, with nothing more than warrants to purchase some of HHI's equity. (Compl. Ex. 1; Jenkins Dep. (Defs.' Ex. L) at 178–80.) Although Jenkins was not satisfied by the terms of this Letter of Intent, he testified that "[i]f that was the ultimate structure and the best we could do, it would have been an acceptable transaction in the context of my role as a board member to see that this company got refinanced." (Jenkins Dep. at 179; *but see* Defs.' Ex. GG (Jan. 5, 2001 email from Jenkins to Robbins enumerating the terms of the Westar proposal that were unsatisfactory to Jenkins).)

Westar and other potential bidders for the Companies were concerned that Finova would require full repayment of its loans. (Robbins Dep. (Defs.' Ex. R) at 190; Abrahams Dep. (Defs.' Ex. E) at 65–66.) Robbins, the Companies' President and CEO, was charged with ensuring that the due diligence process went smoothly for investors like Westar. (Robbins Dep. (Defs.' Ex. R) at 185–86.) However, there is some evidence that Windley was supposed to arrange a meeting between Westar and Finova but did not do so. (Emont Dep. Oct. 31, 2002 at 115 (opining Windley had responsibility to arrange the meeting); Jenkins Dep. Oct. 25, 2002 at 271–72 (stating Windley had relationship with Finova).) Westar never made a binding offer to purchase HHI, and its non-binding Letter of Intent expired in January 2001.

The Companies entered February of 2001 at least $16.5 million in debt to Fino-

---

tion of any loan made by Windley to the companies was provided to the firm. (Dupree Dep. at 65.)

**11.** In many cases, such as here, Plaintiffs have not specifically controverted Defendants' facts. "Plaintiffs deny the statement as presented," (e.g., Pls.' Resp. & Opp'n to Defs.' Statement of Undisputed Material Facts ¶ 29) is insufficient to create issues of fact. *See* Fed.R.Civ.P. 56(e) (adverse party's response "must set forth specific facts showing that there is a genuine issue for trial"). It is not the Court's duty comb the record to attempt to find reasons to deny a motion for summary judgment. *Powers v. CSX Transp., Inc.,* 190 F.Supp.2d 1284, 1286 n. 2 (S.D.Ala.2002). The Court declines to search the record on behalf of either party for facts not brought to the Court's attention in the briefs and statements of fact.

**12.** Finova required that the Companies obtain the services of a consultant. The Companies hired Kugman & Associates, Inc. ("Kugman") in mid–2000. Kugman is a consulting firm that deals with companies that have been in financial distress.

va, more than $2 million in debt to Windley, approximately $10 million in debt to Medicare, and $7 million in debt to other creditors, some of which were antecedent and had begun, or threatened to begin, collection litigation. (Lumpkin Aff. (Defs.' Ex. C) at ¶¶ 4–5; Hughes Dep. (Defs.' Ex. K) at 192–93; Lumpkin Dep. (Defs.' Ex. P) at 344; Windley Dep. (Defs.' Ex. T) at 183.) In all, HHI's liabilities exceeded assets by approximately $20 million.[13] At that time, Finova was "sweeping" some of HFI's accounts (excluding some operating and payroll accounts) and retaining a substantial portion of the swept funds. (Lumpkin Mar. 27, 2003 Dep. (Defs.' Ex. P) at 106–07, 132.) In spite of these financial issues, there is some evidence that the company's financial condition and cash flow had improved in the six months prior to foreclosure. (Abrahams Dep. at 99, 149.)

In early 2001, Finova itself was experiencing financial difficulties; Finova filed for bankruptcy on March 7, 2001. (Abrahams Aff. (Defs.' Ex. B.) ¶ 5.) Defendants contend that Finova's growing financial difficulties meant that Finova would no longer be tolerant of HHI's defaults and wished to end the lending relationship. (*Id.;* Defs.' Ex. JJ (July 11, 2001 memo from Robbins to HHI Board of Directors emphasizing Finova's desire "to exit the relationship as rapidly as possible").) As described *infra,* however, Plaintiffs argue that Finova secretly intended a continuing relationship with Windley and HHI. (*See* Pls.' Exs. 50 ("Four Seasons Healthcare Proposal" dated Jan. 24, 2001), 58 (draft terms of Healthfield restructuring memo dated Feb. 1, 2000).)

On February 22, 2001, Finova sent HHI a Notice of Default and Foreclosure (the "Foreclosure Notice"), cataloguing various events of default and announcing that it was foreclosing on all collateral pledged by HHI, including its equity in HFI. (Defs.' Ex. DD.) The February 22 Notice stated that the public foreclosure auction was to take place on March 9, 2001. (*Id.*)

## B. The Heart of the Dispute: Windley's and Finova's Pre–Foreclosure Actions

Plaintiffs contend-and Defendants deny-that Windley engaged in secret negotiations with Finova for many weeks prior to the foreclosure. According to Plaintiffs, Defendants knew about Finova's foreclosure weeks or months beforehand, and were planning to buy the Companies at the foreclosure and freeze Plaintiffs out of the deal. Defendants explain that Windley was negotiating with Finova in an attempt to restructure the existing loans and in hopes of avoiding foreclosure. Following is a sampling of the relevant evidence.

Plaintiffs point to the testimony of several individuals who indicated that negotiations between Windley and Finova had been ongoing for weeks prior to the Foreclosure Notice. (Anderson Dep. at 25–27; Abrahams Dep. at 83, 86, 88–89, 109–11, 113; Kugman Dep. at 87–90, 96–97.)[14]

To corroborate this testimony, Plaintiffs point to Plaintiffs' Exhibit 50, entitled "Four Seasons Healthcare Proposal" and dated January 24, 2001. The Proposal includes a "Transaction Objective," which states that "[t]he proposed transaction will

---

13. The parties dispute whether the Companies were solvent, insolvent, or in the zone of insolvency. As is evident from the discussion of the claims *infra,* the answer to this question is immaterial.

14. The Court notes, however, that it is not at all clear from the evidence to which Plaintiffs cite whether the ongoing discussion regarded terms that Finova would accept at foreclosure (Plaintiffs' view), or terms of a restructuring to prevent foreclosure (Defendants' view).

provide a capital restructuring of Healthfield, creating an accretive event for FOUR SEASONS's debt partners, and establish a key player in the home healthcare services industry." (Pls.' Ex. 50 at I.) Under the heading, "Elements of the Transaction," the Proposal states: "FOUR SEASONS will acquire certain assets and stock from Healthfield, Inc. *It is contemplated Finova will foreclose on Healthfield to protect its security interests.*" (*Id.* (emphasis added))

Plaintiffs also point to correspondence between Kugman, Windley, and Finova referencing a so-called "Four Seasons Healthcare Proposal." On January 27, 2001, for example, an employee of Kugman wrote to Defendants' in-house counsel, John T. Ennis, Sr., regarding "[t]he latest draft of the Four Seasons Healthcare proposal." (Pls.' Ex. 57.) On February 1, 2001, Mr. Kugman wrote a draft letter to Finova regarding the "Terms of Healthfield Restructuring." (Pls.' Ex. 58.) In this draft letter, Kugman stated that Windley was in "agreement with the majority of the proposed terms," which dealt with a term loan of $15.4 million and a company named Four Seasons Healthcare, and Kugman requested "minor modifications" regarding interest payments and the Company's control of cash.[15] (*Id.*)

Plaintiffs further contend that Windley incorporated FSHI for the purpose of using it as a vehicle to acquire the stock at the foreclosure sale. They note that Windley incorporated FSHI on February 16, 2001–just a few days prior to the Foreclosure Notice. (Pls.' Ex. 6 at 6.) Windley testified, however, that the *initial incorporation* of FSHI was not done for the purpose of bidding on the Healthfield stock at the foreclosure. (Windley Dep. Mar. 12, 2003 (Defs.' Ex. RRR) at 468–69. *But see* Kugman Dep. at 90 ("Mr. Windley did tell me that there was a company that he had formed previously that I think was dormant called Four Seasons, and that at some point they may consider a bid for the assets if-if it came down to that.").) Windley did sign the incorporating documents on or around March 9, 2001.so that FSHI could participate in the foreclosure auction. (*Id.* at 7.) Prior to its incorporation, FSHI had been discussed as performing a variety of functions, including recapitalization of HHI in an effort to avoid foreclosure or the potential purchase of a home-care program at Georgia Baptist Hospital. (*Id.* at 50, 468; Windley Aff. (Defs.' Ex. DDD) ¶¶ 46–47.)

Defendants contend that Windley was working in January and early February 2001 to *prevent* foreclosure. (Windley Aff. II (Defs.' Ex. DDD) ¶ 41 (so stating).) Windley states that he had no plans and took no action to purchase or bid for the Companies prior to the February 22 Notice. (*Id.* ¶¶ 42–45.) He submits that he was negotiating with Finova at this time to restructure the loan on behalf of Healthfield to prevent foreclosure. (*Id.* ¶¶ 37–40.) Abrahams corroborates this assertion. (Abrahams Aff. (Defs.' Ex. AAA) ¶ 9 ("As far as I am aware, . . . proposals to Finova were always made pertaining to Healthfield Companies and proposed as alternatives to foreclosure.") Abrahams further asserts that at least one of these proposals "involved using a company called 'Four Seasons Healthcare' as a vehicle for a one-time infusion of capital as a part of a last attempt to forestall foreclosure." (*Id.* ¶ 10.))

On February 22, 2001, when Windley received the Foreclosure Notice, he sent

---

15. As noted above, Plaintiffs do not appear to rely on this letter for the truth of the matter asserted, e.g., that Windley was indeed in agreement on certain points, but to show evidence of Windley's, Kugman's, and Finova's having discussions prior to the Foreclosure Notice.

memoranda to Jenkins, Emont, and Levine. (Defs.' Exs. DD, RR.) In the memorandum to Jenkins and Emont (which he enclosed in his memorandum to Levine), Windley wrote,

I have been informed by Finova that they have called our loan, my guaranty, and elected to foreclose on Healthfield and sell the company via public sale. This is a most unfortunate turn of events but given Finova's own situation of pending Chapter 11, apparently they felt that this was prudent given the circumstances.

I have enclosed the information that we received from Finova, notified Gary Snyder and immediately undertaken a damage control plan with our employees, referral sources and vendors. Tom, Tony and I are working diligently to minimize disruption and manage this process.

As all of you are aware, this is a very bad day at the office for me personally, not to mention my looming personal guaranty. This is a situation that I intend to fight with every effort that I am able to muster and mount a bid for the company on behalf of the management team. We have a solid team and I am confident that we can come forward with a credible offer. I would like to invite each of you to participate with me in this endeavor and co-invest. I would ultimately like for all of us to recoup our investments.

Feel free to call me with any questions.

(Pls.' Ex. DD).

The day he received the Foreclosure Notice, Windley called Abrahams at Finova to plead that Finova not foreclose in light of the improving performance of Healthfield Companies. (Ennis Dep. (Defs.' Ex. J) at 540–41; Abrahams Dep. (Defs.' Ex. E) at 105–06). Abrahams told Windley that Windley would have to talk with other people at Finova, and that Finova was in bankruptcy and wanted its loan paid off. (Ennis Dep. (Defs.' Ex. J) at 541–43.)[16] Abrahams testified that Finova was planning to foreclose independently (Abrahams Dep. (Defs.' Ex. E) at 160), which he states was without regard to the wishes of Windley. (Abrahams Aff. (Defs.' Ex. B) ¶ 7; see also Windley Aff. (Defs.' Ex. D) ¶ 8).

In early March, Kugman arranged an Escrow Agreement between FSHI, Finova, and Kugman as escrow agent. (See Pls.' Ex. 66.) On March 5, 2001, a total of $1 million was wired to this escrow account at Windley's direction. Five hundred thousand dollars were wired by Rob Griffin and came from the Companies' operating account, and an additional $500,000 were wired by Lisa Shunnarah from her joint account with Windley. The wire by Griffin came from HFI funds; according to Defendants, this money was in partial repayment of Windley's loans to the Healthfield Companies. (Windley Dep. (Defs.' Ex. T) at 22–24; Lumpkin Dep. (Defs.' Ex. P) at 131–32.) Windley testified that he needed the money to have "the qualification in order to bid at the foreclosure." (Windley Dep. (Defs.' Ex. T) at 23.) Robbins, the Companies' CEO, and the Plaintiffs were not informed of this transfer. According to Ennis, however, such a

---

**16.** Defendants contend that Abrahams and Windley were not on civil speaking terms during the time of the foreclosure notice, but the evidence to which they cite does not necessarily support such a proposition. (See Abrahams Dep. at 158–61 (Abrahams noting he and Windley did not talk with each other during 2000–01, stating he would not characterize his and Windley's relationship as close, but admitting the truth of the allegation in the Complaint that he had a close relationship with Windley).)

payment was in "the normal course of business." (Ennis Dep. (Defs.' Ex. J) at 332.)[17]

A teleconference was held on March 8, 2001; all of the members of the Board were included in at least part of the conference, as were bankruptcy counsel.[18] At that time, Jenkins proposed putting HHI into Chapter 11 bankruptcy. (Robbins Dep. (Defs.' Ex. R) at 149–150; Jenkins Dep. (Defs.' Ex. L) at 189–92; Emont Dep. (Defs.' Ex. H) at 205.) During the teleconference, a poll was taken and Robbins, Windley, Ennis and Emont opposed Jenkins' bankruptcy proposal. (Emont Dep. (Defs.' Ex. H) at 205; Robbins Dep. (Defs.' Ex. R) at 150; Ennis Dep. (Defs.' Ex. J) at 323; Jenkins Dep. (Defs.' Ex. L) at 191.) Also discussed during the teleconference was the fact that Windley would mount a bid and Jenkins might also do so on behalf of Plaintiffs. (Ennis Dep. (Defs.' Ex. J) at 144–48; Emont Dep. (Defs.' Ex. H) at 73–76.)

Prior to the foreclosure auction, there were no stated objections to either Windley's or Jenkins' plans to bid at the auction. Plaintiffs declined to join in Windley's bid for HFI. Instead, Jenkins informed Windley that Plaintiffs were going to place their own bid for HFI at the foreclosure auction. (Jenkins 30(b)(6) Dep. (Defs.' Ex. M) at 95–96; Robbins

Dep. (Defs.' Ex. R) at 135; Strange Dep. (Defs.' Ex. S) at 251.)[19]

Several of those present at the March 8 conference directed that a letter be sent to Finova placing it on notice of potential lender liability and reserving rights against it. A draft letter was prepared, but it was never sent to Finova. Defendants explain that the draft was not sent on the advice of counsel because it contained strong rhetoric. (Robbins Dep. (Defs.' Ex. R) at 622–23; Ennis Dep. (Defs.' Ex. J) at 295–321, 840–43.) Apparently, some attempt was made to reach Jenkins about the language of the letter but he was not reached. (Ennis Dep. (Defs.' Ex. J) at 302–05.) Plaintiffs emphasize that they were never informed of the decision not to send the letter.

In addition, Plaintiffs contend that payroll taxes were discussed at the March 8 conference. Apparently, taxes were owed in the approximate amount of $900,000, and Plaintiffs wanted those to be paid before the foreclosure because of their concerns about personal liability. (*See* Ennis Dep. at 171–72 (stating Robbins was told to see how much money was available and pay as much as he could); Pls.' Ex. 74 at 1 (Kugman's notes reflecting expressed desire to have payments made).) No payments on payroll taxes were made prior to the foreclosure, and Plaintiffs contend that as a result there was extra company cash

---

**17.** Defendants also cite Defendants' Exhibit U, which appears to be an assortment of papers identifying amounts owed by the Companies to Windley, such as a copy of a promissory note and two sheets tabulating "Loans from RDW." If there is anything on these papers showing payments on Windley's loans made in the normal course of business, Defendants have not identified it and the Court cannot find it.

**18.** Plaintiffs contend that they had made repeated requests for a Board meeting beginning when they learned of the foreclosure.

The evidence they cite, however, does not support this contention. (*E.g.*, Pls.' Ex. 35 (showing pre-Foreclosure Notice emails regarding attempts to arrange Board meeting; Jenkins Dep. at 203 (stating he called March 8, 2001 Board conference call because he was shocked chairman had not called meeting).)) The parties further appear to dispute whether this meeting was properly convened. That issue, however, is immaterial.

**19.** (*See* Jenkins 30(b)(6) Dep. At 96 ("we were in a majority control position").)

to be acquired at the foreclosure sale. (*See* Pls.' Ex. 6 at 10 (showing cash assets when company was acquired in excess of $3 million).)

## C. Foreclosure

The foreclosure auction was held in Chicago on March 9, 2001, and was conducted by the law firm of Latham & Watkins, which represented Finova with respect to the foreclosure. Advertisements for the auction were published in the National Association for Home Care ("NAHC") Report (an industry trade journal), the Atlanta Journal Constitution, and the Birmingham News. Finova charged Kugman with generating interest in the auction. More than a dozen prospective bidders were contacted and notified of the impending auction. Approximately twenty potential bidders availed themselves of the opportunity to conduct a due diligence review of the Healthfield Companies prior to the auction. Two potential bidders attended the auction: FSHI and the Phoenix Group. Plaintiffs did not attend the auction or participate in the bidding. After FSHI placed its bid, the Phoenix Group declined to bid and Finova accepted FSHI's bid.

FSHI's bid for HFI's stock incorporated the following consideration: (1) $1 million in cash; (2) assumption of the full balance of Finova loans, estimated at $16.4 million; (3) the issuance of a warrant that would allow Finova to purchase twenty percent of the equity of FSHI for "a nominal exercise price;" and (4) the assumption of the approximately $25 million remainder of HHI's obligations. (*See* Pls.' Ex. 7 at DS 08679–80.) The total purchase price was approximately $41,681,000. (*Id.*) Finova financed the transaction. At the closing, Windley accepted further terms from Finova, including a conversion of $2.6 million he had loaned Healthfield Companies into

equity and a personal guaranty of $2.7 million. (Windley Aff. (Defs.' Ex. D) ¶ 16.)

At the foreclosure sale, David Heller, the attorney running the sale stated, "[a]nd again, so that there's misunderstanding, this bid does not catch us by surprise. We have been in constant discussions with Four Seasons and negotiations. It's been ongoing for some time. We thank Four Seasons for its interest and for its bid." (Pls.' Ex. 80 at 8 (Tr. of Public Sale).)

## D. Procedural History

Plaintiffs filed a predecessor to this case on October 5, 2001. (*APA Excelsior III v. Windley*, No. I:01–CV–2662–RWS.) Plaintiffs filed a voluntary dismissal without prejudice on October 30, 2001, apparently because the parties were involved in settlement negotiations. Plaintiffs filed the instant case on November 21, 2001. In the Complaint, Plaintiffs allege the following causes of action:

I. Violations of Federal Securities Exchange Act of 1934, section 10(b) and Rule 10b–5 promulgated thereunder, against all Defendants.

II. Common Law Fraud or Intentional Misrepresentation and Statutory Fraud, Misrepresentation, or Deceit, and Fraud by Suppression of Fact in a Confidential Relationship, against all Defendants.

III. Conflict of Interest, against Windley.

IV. Breach of Fiduciary Duties and Oppression of Minority Shareholders, against Windley.

V. Fraudulent Conveyance, against all Defendants.

VI. Deceptive Trade Practices, against all Defendants.

VII. Breach of Contract, against Windley, HFI, and HHI; Breach of Implied Covenant of Good Faith and Fair Dealing, against Windley, HFI, and HHI;

Tortious Interference, against FSHI and FSHLLC.

VIII. Accounting, Resulting or Constructive Trust, Restitution of Unjust Enrichment and Declaratory Relief, against all Defendants.

Defendant FSHI counterclaimed with a single count, alleging that Plaintiffs committed tortious interference with business relations and prospective business relations in connection with their activities in filing this lawsuit.[20] As described previously, several motions for summary judgment are now pending.

## Discussion

### A. Standards

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Motions for Summary Judgment on Plaintiffs' Claims

#### 1. Federal Securities Claims

Cause of Action I of Plaintiffs' Complaint is a claim under § 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 promulgated thereunder, and controlling person liability under § 20(a). Defendants and Humana have moved for summary judgment on the federal securities claims.

#### a. Standing

■ Two standing issues must be resolved prior to assessing the substantive elements of the claims. To have standing to bring a private securities claim under § 10(b) or Rule 10b–5, one must be a purchaser or seller of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *see Kaplan v. Utilicorp United, Inc.*, 9 F.3d 405, 408 (5th Cir.1993) (plaintiff who lacked standing for direct action under § 10(b) also lacked standing for § 20(a) controlling person claim). First, the parties contest whether Plaintiffs owned HFI stock at the time of the foreclosure sale and hence, whether Plaintiffs may sue HFI for securities violations.[21] Second, the parties contest whether the "forced seller doctrine" applies and consequently, whether Plaintiffs have standing to sue HHI.

#### i. Plaintiffs' ownership of HFI securities

■ To assess Plaintiffs' standing to sue HFI for securities violations, the Court must resolve whether Plaintiffs retained any ownership of HFI stock following its

---

**20.** The facts relevant to the counterclaim are discussed *infra* Part III.C.

**21.** It is undisputed that Plaintiffs never purchased or sold securities in FSHI or FSHLLC, and so Defendants' Motion for Summary Judgment is hereby **GRANTED** as to FSHI and FSHLLC on Cause of Action I; Humana's Motion for Summary Judgment on Federal Securities Claims is hereby **DENIED** as to those Defendants.

merger and conversion of shares.[22] The Merger Agreement provides that a wholly-owned subsidiary of HHI, "Sub," will merge with and into HFI. (Defs.' Ex. AA. at ¶ 1.1.) Thereafter, HFI becomes the surviving corporation and is a wholly-owned subsidiary of HHI. (*Id.*) By virtue of the merger, each share of HFI is to be "converted into and represent the right to receive" one corresponding share of HHI stock. (*Id.* ¶ 4.1.) Further, the Agreement provides that shares of HFI stock prior to the merger must be surrendered and will be deemed surrendered. (*Id.* ¶ 4.2.)

This scenario appears to be what is sometimes called a "reverse triangular merger," in which a target corporation (here, HFI) becomes a wholly-owned subsidiary of a parent corporation (HHI) without any change in its corporate existence. *See Binder v. Bristol–Myers Squibb,* 184 F.Supp.2d 762, 771–72 (N.D.Ill.2001) (applying Delaware law) (explaining various mergers). The effect of this transaction is that shareholders in the target corporation (HFI) lose their shares in the subsidiary and become shareholders of the parent (HHI). *See Lewis v. Ward,* No. Civ.A. 15255, 2003 WL 22461894, at *1 (Del.Ch. Oct.29, 2003) (describing such a merger and loss of shares in subsidiary). This result comports with the language of the Merger Agreement. (*See* Defs.' Ex. AA at DS 06560 ("the stockholders of Healthfield [HFI] immediately prior to the Merger shall become stockholders of Holdings [HHI]").)

Based on the foregoing, the Court holds that Plaintiffs no longer owned shares of HFI after the Merger Agreement went into effect. Those shares were converted into shares of HHI. The Court further notes that all of the complained-of actions took place following the merger, and Plaintiffs have not challenged the merger itself. Thus there appears to be no reason why Plaintiffs should be treated as stockholders of HFI for purposes of this suit. *Cf. Schreiber v. Carney,* 447 A.2d 17, 22 (Del. Ch.1982) (plaintiff, whose shares were converted in merger, had standing to bring state derivative action where he sought to challenge actions taking place prior to and in connection with merger).[23] Accordingly, Defendants' Motion for Summary Judgment is hereby **GRANTED** as to HFI on Cause of Action I; Humana's Motion for Summary Judgment on Federal Securities Claims is hereby **DENIED** as to HFI on these same claims.

*ii. Forced seller doctrine*

The parties contest the application of the "forced seller doctrine." As noted

**22.** Contrary to Plaintiffs' assertion, the Court did not resolve this issue in its Order entered June 14, 2002 (the "June 2002 Order"). For purposes of the pending motions, the parties treat this issue as though it is a question of fact. The issue, however, involves interpretation of the Merger Agreement under Delaware law and is therefore one of law-something neither side discusses. (*See* Defs.' Ex. AA ¶ 6.7 (providing agreement is governed by Delaware law).) Finding no Georgia case law that would fail to give effect to this contract provision, this Court applies Delaware law. *See generally C. A. May Marine Supply Co. v. Brunswick Corp.,* 557 F.2d 1163 (5th Cir. 1977) (applying Wisconsin law in accordance with contract); *cf. Keener v. Convergys Corp.,* 205 F.Supp.2d 1374, 1378 (S.D.Ga.2002)(the law of the jurisdiction chosen by parties to a contract will not be applied by Georgia courts if it contravenes the policy of the state).

**23.** The relationship between Plaintiffs and HFI is thus distinguishable from that of Plaintiffs and HHI, discussed *infra.* Plaintiffs do not challenge the merger and cannot be considered forced sellers of HFI stock. In contrast, it is Plaintiffs' challenge to the actions surrounding the forfeiture of HHI's assets that gives rise to the possibility of the forced seller doctrine giving Plaintiffs standing to sue HHI for securities violations.

above, a party must be a purchaser or seller of securities to have standing under § 10(b) and Rule 10b–5. Some courts have relaxed this rule by way of the forced seller doctrine. *See Dudley v. Southeastern Factor & Finance Corp.,* 446 F.2d 303, 307 (5th Cir.1971) ("a shareholder should be treated as a seller when the nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares"); *Herpich v. Wallace,* 430 F.2d 792, 806 (5th Cir.1970) (describing general rule).[24] *But see Isquith v. Caremark Int'l,* 136 F.3d 531, 536 (7th Cir.1998) (holding forced seller doctrine is no longer good law).

By the June 2002 Order, this Court rejected Defendants' argument that the doctrine is no longer viable and denied their motion to dismiss on that basis. Defendants ask the Court to reconsider that ruling; however, they make no effort to meet the standards for reconsideration. *See Deerskin Trading Post, Inc. v. United Parcel Serv. of Am., Inc.,* 972 F.Supp. 665, 674 (N.D.Ga.1997) (a motion for reconsideration should not be used to reiterate arguments that have been made previously, but "should be reserved for certain limited situations, namely the discovery of new evidence, an intervening development or change in the law, or the need to correct a clear error or prevent a manifest injustice"). As discussed in the June 2002 Order, the Court considers itself bound by former-Fifth Circuit authority applying the forced seller doctrine. *See Alley v. Miramon,* 614 F.2d 1372, 1385 (5th Cir.1980); *Dudley,* 446 F.2d 303; *Coffee v. Permian Corp.,* 434 F.2d 383 (5th Cir.1970); *Hooper v. Mountain States Sec. Corp.,* 282 F.2d 195, 203 (5th Cir.1960).

■ No party has made any attempt to analyze the elements of the forced seller doctrine. Plaintiffs simply contend that it applies, and Defendants simply argue that it should not. Neither is sufficient at the summary judgment stage. Courts have generally required the following elements of the forced seller doctrine: (1) a drastic reduction in the value of the plaintiff's investment; (2) a causal relationship between the alleged fraud and the altered nature of the plaintiff's investment; and (3) an elimination of the prior business entity as a result of the complained-of business transactions. Richard B. Gallagher, Who is "Forced Seller" for Purposes of Maintenance of Civil Action Under § 10(b) of Securities Exchange Act of 1934, 59 A.L.R.Fed. 10, 1982 WL 198735 (2004); *see Dudley v. Southeastern Factor & Fin. Corp.,* 446 F.2d 303, 307 (5th Cir.1971)(stating general principles). The Court concludes that there is sufficient evidence in the record from which a jury could find the first two elements. The parties' failure to point to evidentiary support for the presence or absence of the third element, however, is fatal at the summary judgment stage.

■ As the Court described in the June 2002 Order, a shareholder may be treated as a seller when his investment has been so fundamentally changed as to leave him with nothing more than a claim for payment of money. *Dudley,* 446 F.2d at 307. More particularly, a right to "payment of money" in the Fifth Circuit has always arisen in the context of a liquidation of assets. *See Alley,* 614 F.2d 1372; *Dudley,* 446 F.2d 303; *Coffee,* 434 F.2d 383. A *foreclosure* is distinguishable from *liquidation* for purposes of the forced seller

---

**24.** The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the

Fifth Circuit handed down prior to September 30, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981).

doctrine. *Arnesen v. Shawmut County Bank, N.A.*, 504 F.Supp. 1077, 1082 (D.Mass.1980).

In *Arnesen,* for example, the court dismissed a claim alleging facts very similar to those here because the corporation involved had not been liquidated. There, the plaintiff shareholders alleged that the defendant bank and other third-party defendants had orchestrated a foreclosure of the corporation's assets. *Id.* at 1081. An auction was held, and all the corporation's assets were sold to a new corporate entity that was run by some of the defendants and financed by the defendant bank that had initiated foreclosure. *Id.* The plaintiffs were left with stock of little or no value in a corporation that had ceased its active existence but never been liquidated. *Id.*

The court held that these allegations were insufficient to survive a motion to dismiss because the corporation had not been liquidated. The court reasoned that when liquidation occurs, there is no doubt that any ownership interest in a company has been converted to claims of cash. *Id.* at 1082 (citing *Dudley,* 446 F.2d 303). Even though liquidation may be a formality where a corporation's sole assets were the foreclosed-upon stock, the court explained that it is proper and in keeping with the policies emphasized in *Blue Chip Stamps* to construe the forced seller doctrine narrowly. *Id.* In sum, the court concluded that the plaintiffs spoke not as investors but "as shareholders complaining of alleged corporate mismanagement." *Id.; see also Batchelder v. N. Fire Lites, Inc.,* 630 F.Supp. 1115, 1120–21 (D.N.H. 1986) (even though corporation continued to exist only as shell, argument that shares were "valueless" could not succeed because plaintiffs still had ownership interest in corporation). *See generally Jacobs v. Winthrop Fin. Assocs.,* 77 F.Supp.2d 206 (D.Mass.1999) (recognizing continued viability of *Arnesen's* reasoning).

■ *Arnesen's* reliance on Fifth Circuit authority, and its reasoning, make it particularly persuasive to this Court. Yet the parties have provided nothing to show how its principles might apply in this case. Plaintiffs have pointed the Court to no evidence showing the corporate status of the Healthfield Companies. They state, without citation to evidence, that "[a]s a result of the foreclosure sale, FSHI and Mr. Windley wound up immediately owning all the assets of Healthfield Holdings, Inc." (Pl. Humana Inc.'s Statement of Material Facts as to Which There is no Genuine Issue to be Tried on Fed. Sec. Claims [85] ¶ 62.) Defendants dispute this statement, and write that "[f]ollowing the foreclosure auction, Four Seasons Healthcare, Inc. owned the stock of Healthfield, Inc. subject to a $41 million debt and a personal guarantee by Rod Windley." (Defs.' Resp. to Pl. Humana's Statement of Material Facts [108] ¶ 62.)[25] Next, Plaintiffs state that "[t]he Minority Shareholders, who had invested a total of approximately $10 million, wound up with nothing." (Pl. Humana Inc.'s Statement of Material Facts [85] ¶ 63.) Once again, this statement is supported by no citation to evidence. Defendants' response sheds no further light on the matter: "Plaintiffs retained ownership of their stock and warrants in HHI, but HHI had no, or virtually no, assets after the foreclosure auction." (Defs.' Resp. to Pl. Humana's Statement of Material Facts [108] ¶ 63.) This response lacks any citation to evidence.

25. Defendants cite to Defs.' Ex. TT, a copy of the foreclosure and loan documents, and Windley's Affidavit (Defs.' Ex. D) ¶ 15 (listing terms of the bid at the foreclosure auction). Neither of these items is helpful to the issue at hand.

As noted above, the facts alleged here are very similar to those alleged in *Arnesen.* Unlike *Arnesen,* however, this case is at the summary judgment stage. The parties here had the opportunity to show the Court evidence relating to the status of HHI and whether Plaintiffs have nothing more than a claim for cash; both parties failed to do so. Moreover, the Court in the June 2002 Order put the parties on notice that liquidation could be an issue. (*See* June 2002 Order at 15.) This lack of showing precludes Humana's Motion for Summary Judgment on the Federal Securities Claims. The Court therefore turns to whether-presuming Plaintiffs could show the forced seller doctrine is applicable at trial-Defendants are nevertheless entitled to summary judgment as to the substantive elements of the securities causes of action. *See Gerrard v. A.J. Gerrard & Co.,* 285 F.Supp.2d 1331, 1348 (S.D.Ga.2003) (denying plaintiffs' motion for summary judgment on securities claims but considering remaining elements to reach conclusion on defendant's motion for summary judgment).

**b. Elements of § 10(b) claims**

Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe," and Rule 10b–5 promulgated thereunder, making it unlawful "[t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which

they were made, not misleading." 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5.

To prevail on a securities fraud claim under section 10(b) and Rule 10b–5, a plaintiff must show: (1) a misstatement or omission of a material fact, (2) made with scienter, (3) on which plaintiff relied, (4) that proximately caused his injury. *See Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001); *Robbins v. Koger Prop., Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997); *Ross v. Bank South, N.A.,* 885 F.2d 723, 728 (11th Cir.1989) (en banc).

*i. Material false statements*

 Plaintiffs have catalogued numerous statements they contend are false, along with numerous omissions. The Court concludes that there are genuinely disputed issues of material fact with respect to at least three misrepresentations or material omissions: Windley's omission in not disclosing that he was using $500,000 of company money in support of his bid; his omission in not disclosing his pre-foreclosure negotiations with Finova; and his statements implying that the cost of restructuring the Finova loan would require repayment of the entire loan.[26]

Materiality is met where disclosure of the false statement or omission "would alter the total mix of facts available to the investor and if there is a substantial likelihood that a reasonable shareholder would consider it important to the investment decision." *In re World Access, Inc.,* 310 F.Supp.2d 1281, 1290 (N.D.Ga.2004) (internal quotations omitted). With respect to the $500,000, Defendants claim that this omission was immaterial because (a) Plain-

---

**26.** Because the Court finds that there are genuine issues of material fact with regard to these misstatements or omissions, the Court does not further evaluate Plaintiff's more tenuous bases for meeting this element. These include Windley's statements in his memoran-

dum that he would "fight with every effort," and that he was providing what "we have received from Finova;" that the payroll taxes would be paid; and that the warning letter to Finova would be sent.

tiffs were not entitled to this money; and (b) HHI could not have used it to mount its own bid. As Defendants explain, the $500,000 was not owed to Plaintiffs; it either would have been paid to creditors or it would have been "swept" by Finova prior to foreclosure. (Abraham Aff. (Defs.' Ex. B) ¶ 17.) This argument, however, misses the point: had Plaintiffs known about Windley's use of the money, Plaintiffs would have been more cautious. They could have notified Finova and demanded the return of the money, possibly preventing Windley from mounting his bid. Given the financial status of the company and the impending foreclosure, it seems almost inescapable that a jury could find that this omission was material.

Likewise, Windley's failure to inform Plaintiffs about his previous negotiations with Finova and that Finova was willing to refinance most of the debt was material. Plaintiffs have provided evidence showing that they would have pursued a similar bid had they known this was a possibility. By withholding this information, Windley denied Plaintiffs the ability to assess the situation fully. Defendants argue that Windley could not have disclosed his planned bid because it would have been a securities violation. This argument is a red herring because Defendants provide no evidence that Windley failed to disclose the information for that reason, or that if he had, it would as a matter of law somehow excuse his conduct. Based on the foregoing, the Court concludes that, taking the evidence in the light most favorable to Plaintiffs, a jury could reasonably find that Windley made material false statements or omissions.

#### ii. Made with scienter

██ The parties do not dispute that this element is met. Furthermore, the Court concludes that there is sufficient evidence from which a jury could find this element. Scienter means "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In the Eleventh Circuit, a showing a severe recklessness is sufficient to satisfy the scienter element. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001). Severe recklessness is more than mere simple or even inexcusable neglect, but must be an extreme departure from the standards of ordinary care. *Id.; see also Druskin v. Answerthink, Inc.*, 299 F.Supp.2d 1307, 1323 (S.D.Fla.2004). There is no dispute that Windley knew of the $500,000 and Finova's willingness to finance his bid. There is also evidence that he was aware of the Plaintiffs' concern about the Companies' financial situation and the impending foreclosure-and more specifically, about their interest in mounting their own bid. A jury could infer from the facts that the standard of ordinary care-which here included making decisions in the best interest of the Companies rather than for Windley personally-was departed from in the extreme in this case.

#### iii. Reasonable reliance

██ Presuming Plaintiffs could show that the forced seller doctrine is applicable, they must show causation, but not reliance.[27] Reliance is "unnecessary in the limited instance when no volitional act is required and the result of a forced sale is exactly that intended by the wrongdoer.... What must be shown is that

---

27. Thus, the Court's analysis here differs from that with respect to Plaintiffs' state-law fraud

claims, discussed *infra* Part III.B.2.

there was deception ... and that this was in fact the cause of plaintiff's injury." *Vine v. Beneficial Fin. Co.*, 374 F.2d 627, 635 (2d Cir.1967); *see also Alley v. Miramon*, 614 F.2d 1372, 1385 (5th Cir.1980) (reaffirming, following *Blue Chip Stamps*, Fifth Circuit's adoption of *Vine*); *Kirwin v. Price Communications Corp.*, 274 F.Supp.2d 1242, 1249–50 (M.D.Ala.2003) (describing rule that reliance is not required in forced seller cases).

 Defendants argue that the Eleventh Circuit mandates that reliance is required in *all* 10(b) cases. The cases they cite for this proposition, however, do not involve the forced seller doctrine and are therefore inapposite.[28] *See generally Gochnauer v. A.G. Edwards & Sons*, 810 F.2d 1042 (11th Cir.1987) (examining reliance in traditional 10(b) case where standing and forced seller doctrine were not at issue); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 548 (5th Cir. Unit A Mar.1981) (stating reliance is required in all 10b–5 cases, but not considering special circumstances of forced seller cases).

*iv. Causation*

 In ordinary 10b–5 cases, the causation element requires both "transaction causation" and "loss causation." *Bruschi v. Brown*, 876 F.2d 1526, 1530 (11th Cir. 1989). Transaction causation requires a plaintiff to show that the defendant's actions induced the transaction-usually a sale of securities. *Id.; In re Checkers Sec. Litig.*, 858 F.Supp. 1168, 1177 (M.D.Fla.

1994). Loss causation requires the plaintiff to show that the falsehood was in some reasonably direct, or proximate way, responsible for his loss. *Bruschi*, 876 F.2d at 1530; *Checkers*, 858 F.Supp. at 1177.

Defendants acknowledge that transaction causation is "another way of describing reliance." *Robbins v. Koger Props.*, 116 F.3d 1441, 1447 (11th Cir.1997). As set forth above, reliance is not an element in forced seller cases. While causation is a required element, it is only loss causation that the Plaintiffs must show. *Shores v. Sklar*, 647 F.2d 462, 480 (5th Cir. May 1981); *Kirwin v. Price Communications Corp.*, 274 F.Supp.2d 1242, 1250 (M.D.Ala. 2003). With respect to loss causation, "the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he suffered;" the plaintiff need only show that it was a substantial or significant contributing cause. *Bruschi*, 876 F.2d at 1531. Thus, plaintiffs may not recover where their loss is a result of market conditions or a company's insolvency. *Id.* Instead, the fact misstated must be of a nature calculated to bring about the result that occurred. *Id.*

Here, Defendants essentially argue that any loss to the Plaintiffs was caused by HHI's insolvency, not by any misstatements or omissions by Windley. They emphasize that it is uncontroverted that HHI was in default and that Finova was entitled to foreclose on its valid security interest.[29] Neither Plaintiffs nor De-

---

**28.** Defendants are correct that, contrary to Plaintiff's assertion, mixed cases of omissions and affirmative representations do not require the shifting of burdens with respect to reliance described in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *See Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 757 (11th Cir.1984) (holding mixed cases do not require the application of the *Affiliated Ute*

presumption). Even so, the authority on which Defendants rely does not discuss the special circumstance of forced seller cases. *See generally id.*

**29.** It is true, as Defendants contend, that ordinarily a pledge constitutes a sale of securities under federal securities law. *Rubin v. United States*, 449 U.S. 424, 429–31, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). Defendants go on to

fendants could have stopped the auction, Defendants argue. Plaintiffs' emphasis, however, appears to be on preventing the "freezeout," not necessarily the foreclosure itself. They state that had they known about the $500,000, they could have notified Finova and at least prevented Windley from keeping the money. They further argue that had they known Finova would be willing to accept a bid with only $1 million cash, it is undisputed that they could have prepared a bid in this price range.

■ Taking all the facts and reasonable inferences in the light most favorable to Plaintiffs, the Court concludes there are genuine issues of material fact whether Windley's actions caused Plaintiffs' loss. The key to this conclusion is that a jury could reasonably conclude that Windley's actions in taking the $500,000 and failing to disclose his negotiations with Finova were calculated to bring about the result of Plaintiffs' freezeout. Certainly Windley's actions were not the sole cause of Plaintiffs' loss, but circumstances such as Windley's relationship with Finova, his interest in competing corporations, and his actions in taking $500,000 from a company about to be foreclosed upon, could be viewed by a jury to have caused Plaintiffs' freezeout. On the other hand, a jury could conclude that Plaintiffs' loss was merely a result of changing financial conditions such that loss causation has not been met. Accordingly, Defendants are not entitled to summary

judgment as to the § 10(b) and Rule 10b–6 portions of Plaintiffs' claims against Windley.

### c. Corporate liability

■ Both sides address corporate liability in the context of their § 20(a) controlling person discussions. The § 20 controlling person liability is not, however, the exclusive means by which a corporate entity may be liable. *Paul F. Newton & Co. v. Tex. Commerce Bank*, 630 F.2d 1111, 1119 (5th Cir.1980) ("§ 20 does not supplant or exclude the application of common law principles of agency, in particular the doctrine of respondeat superior, in an action brought under the Securities Exchange Act"); [30] *see In re Villa*, 261 F.3d 1148, 1152 (11th Cir.2001) (citing *Paul F. Newton* with approval and noting distinction between § 20(a) and agency theories of secondary liability). Indeed, the principles of agency may be used to impute the actions of corporate officers and directors to the corporation itself-in essence, making the corporation liable under § 10(b) and Rule 10b–5. *See Paul F. Newton*, 630 F.2d at 1118 (describing with approval concept that securities laws meant to reach corporations; corporations are included in definition of "person," necessitating use of agency principles because corporations can act only through their agents).

■ "[A] corporation may be held liable co-extensively with the officer or em-

---

argue that Plaintiffs do not contest any of the facts surrounding the initial pledge of the stocks, and so cannot show causation. But these cases cited by Defendants do not address the situation presented here where "a defaulting pledgor of stock has standing as a seller of securities when the pledgor's stock is sold to pay off the loan against which the stock is pledged." *TCF Banking & Sav., FA v. Arthur Young & Co.*, 706 F.Supp. 1408, 1416 (D.Minn.1988) (distinguishing forced-sale cases when presented with plaintiff's attempt

to evade statute of limitations by arguing that sale took place on (non-forced) foreclosure of security interest). ·

**30.** *Paul F. Newton* expressly rejected *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880 (3d Cir.1975); the Court thus does not discuss *Rochez's* corresponding district court case, upon which Defendants rely. *See Paul F. Newton* 630 F.2d at 1117–19 (rejecting *Rochez*).

ployee actually responsible for the fraudulent conduct engaged in while in the course of the employment and while transacting corporate business." *Am. Gen. Ins. Co. v. Equitable Gen. Corp.*, 493 F.Supp. 721, 747 (E.D.Va.1980); *see also Paul F. Newton*, 630 F.2d at 1119; *Crawford v. Johnson*, 227 Ga.App. 548, 552–53, 489 S.E.2d 552 (1997) (employers are liable under respondeat superior for fraudulent acts done in the course of employment).

■ Defendants state that there is no evidence Windley was acting as an agent for any of the corporate Defendants when he made any misstatements or omissions. Yet there is ample evidence in the record supporting HHI's corporate liability as the principal for whom Windley was an agent, particularly with respect to Windley's negotiations with Finova.[31] Windley "had the relationship" with Finova and numerous pre- and post-foreclosure notice documents evidence that he was negotiating in his capacity as director of HHI. He was the person who received the Notice of Foreclosure and passed it along to the others, and he was the person whom the others expected to handle negotiations with Finova. Moreover, the Board of HHI put Windley in this position, relying on him to carry out financing negotiations. *See Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 741 (10th Cir.1974) (holding corporation was liable for president's fraudulent acts where corporation made president its principle officer, permitted president to hold himself out as spokesman for corporation and promoter of its business interests), *abrogated on other grounds by Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Accordingly, Defendants' Motion for Summary Judgment is **DENIED** as to Cause of Action I with respect to HHI.

### d. Controlling person liability

■ The Complaint alleges that Windley is liable as a controlling person under § 20(a) of the Securities Exchange Act of 1934, and, in the alternative, that the corporate Defendants are liable as controlling persons of Windley.[32] (Compl.¶¶ 60, 70.) Section 20(a) provides:

---

**31.** The $500,000 may be another matter; the evidence suggests Windley's taking of this money was not done in his role as a director of the company, but as a creditor of the company (viewing the evidence in the light most favorable to Windley) or as a self-interested wrongdoer (viewing the evidence in the light most favorable to Plaintiffs).

**32.** Although these allegations seem circular, the Court has located authority allowing plaintiffs to proceed on these alternative theories. *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1134 (W.D.Mich.1996); *see Theoharous v. Fong*, 256 F.3d 1219, 1227–28 (11th Cir.2001) (evaluating plaintiffs' allegations under each theory). Moreover, it is permissible to pursue the theory that an individual is primarily liable, or in the alternative, secondarily liable. *See Morse v. Abbott Labs.*, 756 F.Supp. 1108, 1112 (N.D.Ill.1991) (rejecting contention that § 20 allegations should be dismissed as re-

dundant of § 10(b) and Rule 10b–5). *But see PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 697 n. 4 (6th Cir.2004) (noting some authority precludes simultaneous assertion of both theories); *Kalnit v. Eichler*, 85 F.Supp.2d 232, 246 (S.D.N.Y.1999) (dismissing secondary allegations on ground that they were inconsistent with plaintiffs' theory of primary liability). Even so, Plaintiffs' argument with respect to HHI is one of primary, not secondary liability. *See supra* Part III.B.1.c. Plaintiffs have presented no evidence or argument as to HHI's control of Windley and its potential liability as a controlling person; this is insufficient at the summary judgment stage and Defendants are thus entitled to summary judgment on Plaintiffs' theory that HHI is liable as a controlling person of Windley. Accordingly, the Court addresses only whether Windley can be liable on the alternative theory of controlling person liability.

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . .

15 U.S.C. § 78t(a). "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person." 17 C.F.R. § 230.405 (2004). A defendant is liable as a controlling person if he "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws and had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *Brown v. Enstar Group*, 84 F.3d 393, 396 (11th Cir.1996). A plaintiff must also establish that the controlled person violated the securities laws. *Id.* at 396–97. Section 20 therefore creates a derivative or secondary liability. *See id.* at 397.

 The Court concludes that there are genuine issues of material fact whether Windley was a controlling person of HHI. Although he was removed as the Healthfield Companies' CEO prior to the events forming the basis for this case, he continued to function as the Companies' Director. In this position, there is evidence that he remained the main contact person for the Companies' lender, Finova, and negotiated on the Companies' behalf for alternate financing. He was the person who received Finova's Notice of Foreclosure, and he was the person who sent memoranda to the officers and directors notifying them of the foreclosure. His ability to exert at least some control over

the Companies is further supported by his taking of the $500,000 without the knowledge or consent of the CEO or other Board members. This evidence is more than sufficient to show that Windley controlled HHI generally and with reference to the specific actions complained of in this case.

The second requirement for controlling person liability is that the controlled person must have committed securities violations. *See Brown*, 84 F.3d at 396–97 (controlled person must have violated the securities laws). As discussed *infra*, HHI cannot avoid summary judgment on that issue. To summarize, there are genuine issues of material fact whether: (1) HHI is liable for securities violations under § 10(b) based on Windley's acts; and (2) whether Windley is liable as a controlling person under § 20(a) in the alternative to being primarily liable under § 10(b).

### 2. Fraud, Misrepresentation, and Suppression of Fact

Cause of Action II alleges claims of common-law fraud, statutory fraud, and fraud by suppression of fact in a confidential relationship against Windley and the corporate Defendants. Defendants and Fostin have moved for summary judgment on these claims.

#### a. Windley

 A plaintiff must show five elements to establish the tort of fraud: "a false representation by a defendant, scienter, intention to induce plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." *Stiefel v. Schick*, 260 Ga. 638, 639, 398 S.E.2d 194 (1990).[33] Georgia law further provides

---

**33.** Plaintiffs cite several statutory provisions for their fraud claims, including O.C.G.A. §§ 51–6–2, 23–2–51, and 23–2–53. Section

51–6–2 relates to the tort of wilful misrepresentation of a material fact. Section 23–2–51 relates to fraud as a ground for equitable

that "[s]uppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." O.C.G.A. § 23–2–53; *GE Life & Annuity Assurance Co. v. Barbour*, 191 F.Supp.2d 1375, 1383 (M.D.Ga.2002). As is evident by this standard, any reliance on a representation must be reasonable. *GCA Strategic Investment Fund, Ltd. v. Joseph Charles & Assocs.*, 245 Ga.App. 460, 464, 537 S.E.2d 677 (2000). This element requires a plaintiff to exercise due care to discover the fraud. *Id.; see also Williams v. Dresser Indus.*, 120 F.3d 1163, 1171–72 (11th Cir.1997) (affirming grant of summary judgment to defendant where plaintiff relied on representations without using the means available to him, in the exercise of diligence, to discover the truth). With respect to statements that amount to opinions, hopes, expectations, or puffery, moreover, the listener is not justified in relying on such statements and must inquire into them and attempt to ascertain the truth. *GCA Strategic*, 245 Ga.App. at 464, 537 S.E.2d 677.

Plaintiffs identify the same alleged misrepresentations and omissions as serving the basis for their fraud claims as for their securities fraud claims. These include: Windley's omission in not disclosing that he was using $500,000 of company money; his omission in not disclosing his pre-foreclosure negotiations with Finova; and his statements implying that the cost of restructuring the Finova loan would require repayment of the entire loan. They also include: Windley's statements in his memorandum that he would "fight with every effort," and that he was providing what "we have received from Finova;" that the payroll taxes would be paid; and that the warning letter to Finova would be sent.

With respect to the former grouping, the Court relies on its reasoning set forth in the securities fraud discussion to conclude that there are genuine issues of material fact with respect to false representations, scienter, intention to induce (as discussed *supra* under loss causation), and damage, leaving only the confidential relationship issue and reliance for Defendants' Motion for Summary Judgment on this Cause of Action. Because the Court holds that there are genuine issues of material fact as to the existence of a confidential relationship and reliance, moreover, neither side is entitled to summary judgment. Therefore, the Court does not consider each element of Cause of Action I (and each of Plaintiffs' additional enumerated misstatements and omissions) to determine whether Plaintiffs would otherwise be entitled to summary judgment.

*i. Confidential relationship*

The Court concludes that there are genuine issues of material fact with respect to whether Windley was in a confidential relationship with Plaintiffs giving rise to a duty to disclose certain facts. As noted above, O.C.G.A. § 23–2–53 provides: "Suppression of a material fact which a

relief and is generally used for contract rescission. Section 23–2–53 governs suppression of a material fact which a party is under an obligation to communicate, and provides that a confidential relationship may give rise to that obligation. As interpreted, these statutes require the same basic elements set forth herein. *See, e.g., GE Life*, 191 F.Supp.2d at 1383 (discussing § 23–2–51); *Marriott Corp.*

*v. Am. Academy of Psychotherapists, Inc.*, 157 Ga.App. 497, 498–99, 277 S.E.2d 785 (1981) (listing elements in § 23–2–51 context); *Brown v. Ragsdale Motor Co.*, 65 Ga.App. 727, 16 S.E.2d 176 (1941) (listing elements in § 51–6–2 context). Except for considering whether there was a confidential relationship, therefore, the Court does not discuss each statutory provision separately.

party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." "Confidential relations" is defined in O.C.G.A. § 23–2–58, which states:

Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

Plaintiffs contend that the "confidential relations" and "particular circumstances" here stem from Windley's fiduciary duties and his position as Chairman of the Companies. They cite *Enchanted Valley RV Resort, Ltd. v. Weese*, 241 Ga.App. 415, 423, 526 S.E.2d 124 (1999), for the proposition that "[a] corporate officer or director owes to the corporation and its stockholders a fiduciary duty or quasi-fiduciary duty, which requires that they act in utmost good faith." Defendants assert that Windley did not owe any such duties to shareholders. This assertion does not comport with the law and does not mesh with the facts of this case. Although Plaintiffs' reliance on fiduciary duties comes dangerously close to the flaw in their corporate mismanagement claims (which, are barred, as discussed *infra* Part III.B.3), the Court holds that there is sufficient evidence here from which a jury

could conclude Windley had a special relationship with Plaintiffs giving rise to a duty to make disclosures. There is conflicting evidence, for example, about Plaintiffs' expectations about Windley's role and his encouragement of those perceptions by taking the lead in working with Finova. *Compare King Mfg. v. Clay*, 216 Ga. 581, 586, 118 S.E.2d 581 (1961) (director dealing with another stockholder for purchase of stock has fiduciary duty to make full disclosure of all facts), *with Bogle v. Bragg*, 248 Ga.App. 632, 636–37, 548 S.E.2d 396 (2001) (company's directors did not have duties to make disclosures to investor with respect to arms'-length transaction).

### ii. Reliance

There are also genuine issues of material fact with respect to reliance. Defendants contend that Plaintiffs were not justified in any reliance on Windley's misstatements or omission regarding whether Finova would require full repayment of its loan and what a likely winning bid would entail because those were mere predictions of future events.[34] They also argue that Plaintiffs had a duty to discern the true facts for themselves.

"It is elementary that no one has the right to rely on a statement of another as to what would and could take place in the future." *Next Century Communications Corp. v. Ellis*, 214 F.Supp.2d 1366, 1371 (N.D.Ga.2002). There is an exception to this general rule, however, when the speaker has "special knowledge" of the matter about which he is speaking "and

---

**34.** Although Defendants focus their argument on these particular misstatements and omissions, the analysis set forth herein is applicable to all of Plaintiffs' alleged misstatements and omissions because there is evidence that they could have exercised due diligence (their representatives were Board members, after all) to determine the true facts as to all of their enumerated complaints. To be clear, the Court has considered every one of Plaintiffs' list of misstatements and omissions and concluded that the reliance element precludes summary judgment in their favor.

the listener is ignorant of the same." *Next Century Communications Corp. v. Ellis,* 318 F.3d 1023, 1029 n. 4 (11th Cir.2003). This exception is narrow; if the listener has equal means of learning the truth but fails to do so, his reliance on the speaker is not reasonable. *Tri–E. Petroleum Corp. v. Glenn's Super Gas, Inc.,* 178 Ga.App. 144, 146, 342 S.E.2d 346 (1986).

In *Next Century,* for example, the Eleventh Circuit affirmed the district court's dismissal of a complaint for fraud. 318 F.3d at 1025. There, the plaintiff alleged that the statement, "I think our share price will start to stabilize and then rise as our Company's strong performance continues" constituted actionable fraud. *Id.* at 1027. The court flatly rejected this argument as to the first portion of the sentence, explaining that "it is framed as a mere opinion as to future events." *Id.* The court further held that the second portion of the sentence about "strong performance" constituted mere puffery. *Id.* at 1028. Finally, the court rejected the plaintiff's argument that the speaker had special knowledge; the plaintiffs had not even alleged that they attempted to ascertain the veracity of the statement. *Id.* at 1028 n. 4.

Plaintiffs have presented evidence that "[w]e were told that there was a requirement for $6 to 10 million of capital. We were not told that Finova had any willingness to roll over their loan." (Jenkins Dep. at 152; *see also id.* at 100.) According to Jenkins, "Finova's requirements were communicated through Rod Windley, who had the relationship." (*Id.* at 99.) They contend that Windley told them that he would be the contact with Finova because of his good relationship with the bank. (*E.g.,* Jenkins Dep. at 101; Emont Dep. II. at 372.) Moreover, although they had a "declining level of trust" for Windley, Plaintiffs argue that they "continued some trust." (Pls.' Resp. to Defs.' Mot. for Summ. J. at 82.)

Defendants emphasize that even if Windley could be said to have had a special relationship with Finova, it is undisputed that Plaintiffs failed to ascertain Finova's requirements for themselves. First, Plaintiff's individual representatives were experienced in investing. Second, Finova attempted to contact Jenkins to generate interest in bids from Plaintiffs, but Jenkins did not return Finova's phone calls. (Abrahams Dep. (Defs.' Ex. E.) At 142–43.) Although Finova would have welcomed Plaintiffs' inquiries, (*id.* at 147), Plaintiffs made no attempts to speak with Finova or its lawyers. (Jenkins Dep. (Defs.' Ex. M) at 91; Emont Dep. (Defs.' Ex. H) at 100–01; Levine Dep. (Defs.' Ex. O) at 150; Beckman Dep. (Defs.' Ex. G) at 94; Anderson Dep. (Defs.' Ex. F) at 100.)

In Georgia, questions of whether a "plaintiff could have protected himself by the exercise of proper diligence are, except in plain and indisputable cases, questions for the jury." *GCA Strategic Investment Fund, Ltd. v. Joseph Charles & Assocs.,* 245 Ga.App. 460, 465, 537 S.E.2d 677 (2000) (internal quotations omitted). Here, neither Plaintiffs nor Windley is entitled to summary judgment because there are genuine issues of material fact whether Plaintiffs' reliance was reasonable. There is conflicting evidence regarding the extent of Windley's relationship with Finova, the boundaries of Plaintiffs' trust in Windley, and the reasonableness of Plaintiffs' reliance on Windley and failure to investigate for themselves.

Based on all the foregoing, Defendants' Motion for Summary Judgment on Cause of Action II as to Windley is hereby **DENIED**; Fostin's Motion for Summary Judgment is hereby **DENIED** as to the same claims.

## b. Corporate Defendants

Defendants contend that the corporate Defendants are entitled to summary judgment as to the fraud claims because Plaintiffs merely attempt to assert the claims on a respondeat superior theory. They argue that even if Windley had committed some actionable fraud, there is no evidence to suggest that any such action was performed in the scope of his agency for any of the corporate Defendants. As to HHI, the Court has already concluded that Defendants are not entitled to summary judgment on this ground. (*See infra* Part III. B.1.c (discussing corporate liability in securities fraud context, based on state common-law agency theories).) That same reasoning applies to HFI, because there is evidence that Windley functioned in the same capacity for both the Healthfield Companies. As to FSHI and FSHLLC, there is evidence that Windley was working in the scope of his agency for those corporations as well. For example, although Windley testified that the initial incorporation of FSHI was not done for purposes of bidding on Healthfield stock, Kugman testified that Windley told Kugman that FSHI might be considered for mounting a bid. When FSHI bid at the foreclosure auction, Windley was there on behalf of the company. Windley's position at Four Seasons, and his involvement in the foreclosure process, create jury questions whether FSHI and FSHLLC are liable for Windley's actions on an agency theory for his affirmative misrepresentations. However, Plaintiffs' confidential relationship theory is not applicable here because, *in his capacity as an agent for Four Seasons*, he was not a fiduciary to Plaintiffs. Thus, Plaintiffs are barred as a matter of law from recovering from FSHI and FSHLLC for Windley's fraud by suppression of fact but may recover for any affirmative misrepresentations a jury finds Windley to have made. Accordingly, neither side is entitled to summary judgment on Cause of Action II, except that Defendants are entitled to summary judgment for FSHI and FSHLLC under O.C.G.A. § 23–2–53.

## 3. Conflict of Interest and Breach of Fiduciary Duty Claims Against Windley

In Cause of Action III, Plaintiffs allege that Windley failed to disclose his conflicts of interest to Plaintiffs. In Cause of Action IV, Plaintiffs allege that he breached his fiduciary duties and oppressed Plaintiffs. Defendants and Fostin have both moved for summary judgment on this Cause of Action.

As an initial matter, the parties contest whether these claims as presented are cognizable under Georgia law. Defendants assert that "conflict of interest" and "usurpation" are not independent causes of action in Georgia. Second, they argue that Plaintiffs' breach of fiduciary duty claim is derivative in nature and cannot be brought as a direct action. Plaintiffs contest these arguments.

### a. Conflict of interest

Defendants argue that Georgia law does not recognize an independent action for "conflict of interest;" rather, it is a description of factual circumstances that may give rise to a breach of the fiduciary duty of loyalty. Plaintiffs respond that O.C.G.A. § 14–2–861(b) provides for a director conflict of interest, while O.C.G.A. § 14–2–864(b) provides similarly for an officer conflict of interest. As § 14–2–861(b) states:

> A director's conflicting interest transaction may not be enjoined, set aside, or give rise to an award of damages or other sanctions, in an action by a shareholder or in the right of the corporation,

on the ground of an interest in the transaction of the director or any person with whom or which he has a personal, economic, or other association, if:

(1) Directors' action respecting the transaction was at any time taken in compliance with Code Section 14–2–862;

(2) Shareholders' action respecting the transaction was at any time taken in compliance with Code Section 14–2–863; or

(3) The transaction, judged in the circumstances at the time of commitment, is established to have been fair to the corporation.

These statutes are intended to provide safe harbors to directors and officers engaging in transactions that entail conflicts of interest. *See* O.C.G.A. § 14–2–861 cmt; *id.* § 14–2–831 (providing for derivative actions to, *inter alia,* enjoin or set aside transactions). Plaintiffs point to no authority, and the Court finds none, utilizing these provisions as bases for independent causes of action. *Cf. Fisher v. State Mut. Ins. Co.,* 290 F.3d 1256, 1260–64 (11th Cir. 2002) (evaluating whether safe harbor provisions were met for purposes of shareholders' derivative suit and rejecting similar claims as non-independent). Accordingly, Plaintiffs' Cause of Action III cannot proceed.

### b. Breach of fiduciary duty

Defendants contend that they are entitled to judgment on this claim because Plaintiffs failed to pursue it as a derivative action. Plaintiffs respond that this action is sufficient because they suffered injuries separate and distinct from that sustained by other stockholders.

In general, "[i]t is an established rule that whenever a plaintiff sues in a stockholder capacity for corporate mismanagement, he must bring the suit derivatively in the name of the corporation." *Citibank, N.A. v. Data Lease Fin. Corp.,* 828 F.2d 686, 692 (11th Cir.1987); *see also Phoenix Airline Servs., Inc. v. Metro Airlines, Inc.,* 260 Ga. 584, 585, 397 S.E.2d 699, 701 (1990) ("The general rule is that actions for fiduciary duties are to be brought in derivative suits."). This rule recognizes that shareholders each suffer harm in proportion to the number of shares owned, and it prevents individual shareholders from obtaining benefits to the detriment of other shareholders. *Citibank,* 828 F.2d at 692–93. To bring a direct action, therefore, "a shareholder must be injured in a way which is different from the other shareholders or independently of the corporation." *Grace Bros., Ltd. v. Farley Indus., Inc.,* 264 Ga. 817, 819, 450 S.E.2d 814 (1994). Plaintiffs contend that they have been injured in a way that is separate and distinct from the other shareholders or Healthfield Companies.

To determine whether such a direct action is properly brought, courts consider "whether the plaintiff is similarly situated to other shareholders, suffers the same injury, and retains the same opportunity to be made whole by a corporate recovery from the wrongdoer." *Citibank,* 828 F.2d at 693. In *Citibank,* for example, the Eleventh Circuit concluded that a direct action was appropriate. There, a shareholder pledged his stock to a pledgee who assumed control of the corporation; the shareholder wished to bring claims against the third parties whom the pledgee had installed on the corporation's board of directors. *Id.* at 689–90. The court reasoned that while the other shareholders could "bail out at will," the pledgor was "captive to the whims of the pledgee." *Id.* at 693. In such circumstances, the pledgee could use its position-acting through the third parties-to intentionally depreciate the stock held by the pledgor in pledge with

the purpose of obtaining the pledged stock at a foreclosure sale. *Id.* Unlike the other shareholders, the pledgor could not bring a derivative action and would lose his opportunity to share in a corporate recovery after the foreclosure sale. *Id.* These possibilities highlighted the distinction between the pledgor and the other shareholders: the pledgee owed duties to the pledgor by virtue of the pledge agreement that were independent of fiduciary duties owed to the pledgor as a shareholder. *Id.* at 694.

Likewise, in *Grace Brothers v. Farley Industries,* the Georgia Supreme Court allowed certain claims to proceed directly while distinguishing others that should have been brought as derivative actions. 264 Ga. 817, 819–20, 450 S.E.2d 814. In that case, shareholders owning five percent of a corporation's stock sued the ninety-five percent shareholder, the corporation, and its board of directors for failing to pursue a merger agreement. *Id.* at 817–18, 450 S.E.2d 814. Under the merger agreement, the plaintiffs were to receive fifty-eight dollars per share upon consummation of the merger agreement. *Id.* at 817, 450 S.E.2d 814. When the merger finally took place, however, the plaintiffs received only forty-six dollars per share. *Id.* at 818, 450 S.E.2d 814. The court held that plaintiffs' breach of fiduciary duty claim could proceed as a direct action because-unlike the majority shareholder-only the plaintiffs stood to receive fifty-eight dollars per share under the merger agreement. *Id.* at 819, 450 S.E.2d 814. As the court explained, "Where, as here, it is sufficiently alleged that the effect of the controlling stockholders' self-serving manipulation of corporate affairs causes a singular

economic injury to minority interests alone, the minority have stated a cause of action for 'special injury.'" *Id.* at 820, 450 S.E.2d 814 (quoting *In re Tri–Star Pictures, Inc. Litig.,* 634 A.2d 319, 332 (Del. 1993)). In contrast, the plaintiffs' claims for corporate waste, based at least in part on upstream payments made pursuant to tax sharing agreements, could not proceed directly because they were "founded upon injuries [that were] no different from [those] suffered by the corporation or the other shareholders." *Id.* at 820, 820 n. 9, 450 S.E.2d 814.

■ Applying these principles to the present facts, the Court concludes that, as a matter of law, Plaintiffs have not suffered injuries separate from those of HHI or other shareholders and may not bring their breach of fiduciary claim as a direct action. Plaintiffs itemize several injuries. First, Plaintiffs contend that they ended up with no ownership in the Companies, while "the controlling other shareholder ended up with 100% of HFI and HHI."[35] Second, Plaintiffs argue that they did not have the opportunity to negotiate secretly with Finova from January through the foreclosure sale, unlike Windley. Third, Plaintiffs contend they did not use at least $500,000 of company money to bid at the foreclosure sale, unlike Windley. Fourth, Plaintiffs state they did not have inside information that Finova would allow loan assumption instead of full payoff, and Windley did. Fifth, they argue that they did not have the extra $900,000 that should have been used for payroll taxes. Finally, they state that Windley acquired $3.3 million of cash.[36]

**35.** As noted previously, HFI's status following the foreclosure is far from clear. Nevertheless, Plaintiffs state that Windley owned 100 percent of FSI and now owns over 50 percent of FSI, which in turn owns 100 percent of HFH and HFI.

**36.** This final statement appears to be an incomplete sentence. The Court presumes Plaintiffs are referring to the amount of Healthfield cash available at the time of foreclosure.

Plaintiffs do not explain how these injuries are any different from those suffered by numerous other shareholders that would benefit from a successful derivative action.[37] Indeed, the other shareholders similarly no longer own shares in the Companies, and they did not have alleged inside information, alleged secret negotiations, or company cash for use in the foreclosure sale. Plaintiffs complain that this result is unfair because they "are no longer shareholders of HFH or HFI, according to Defendants, and would be making a derivative claim." (Pls.' Resp. To Defs.' Mot. for Summ. J. at 70.) Apparently, Plaintiffs mean to argue that they would not have standing to bring a derivative action because they are no longer shareholders. They cite no evidence with regard to their status and provide no case authority supporting their theory. This is insufficient on a motion for summary judgment. The Court notes furthermore that "Defendants have never asserted that Plaintiffs were no longer stockholders in HFH." (Defs.' Reply Br. in Support of Their Mot. for Summ. J. at 26.) In addition, it appears that shareholders are not per se barred from bringing derivative actions following a foreclosure sale. *See generally Taylor v. Terry*, 279 Ark. 97, 649 S.W.2d 392 (1983) (illustrating such an action); *cf. Empire Realty Co. v. Harton*, 176 Ala. 99, 57 So. 763, 764 (1911) ("Once a stockholder, it is clear that that character, and the rights incident and pertaining thereto, cannot be divested by wrongful, legally fraudulent, conduct or action.").

■ Because Plaintiffs have not shown any injuries separate and distinct from those of other shareholders or the corporation, their breach of fiduciary duty claims (Cause of Action IV) cannot survive Defendants' Motion for Summary Judgment.[38]

### 4. Fraudulent Conveyance

Plaintiffs allege in Cause of Action V that the assets of HFH sold at the foreclosure auction were fraudulently conveyed by Defendants. Defendants have moved for summary judgment on this Cause of Action.

Defendants contend that this cause of action cannot succeed because Plaintiffs are not creditors of HFH and the relevant statute does not, therefore, apply to them. O.C.G.A. § 18-2-22 provides that a conveyance, assignment, or transfer shall be fraudulent and therefore "null and void" if made with intent to delay or defraud creditors. Where there is no intent to defraud creditors, summary judgment is appropriate. *Albee v. Krasnoff*, 255 Ga.App. 738, 744, 566 S.E.2d 455 (2002). Defendants point to a lack of evidence that there was intent to defraud creditors; Plaintiffs wholly fail to address this argument or cite to any evidence supporting their claim. Accordingly, Defendants are entitled to summary judgment with respect to Plaintiffs' Cause of Action V.

### 5. Georgia Unfair and Deceptive Trade Practices Act

Plaintiffs allege in Cause of Action VI that Defendants violated the Georgia Un-

---

**37.** These include Coutte & Company, Ltd., CIN Venture Nominee Ltd., Dr. H. Krone, K. Matheson, Dr. S. Cohen, Dr. L. Seriphin, Family Help at Alabama, Sirrom. Capital, and First Source Financial. (Defs.' Ex. 52.)

**38.** To the extent Plaintiffs also attempt to assert a separate claim for usurpation of corporate opportunity, the Court notes that usurpa-

tion is similarly derivative of the corporation and is therefore barred. *See Parks v. Multimedia Techs., Inc.*, 239 Ga.App. 282, 286–88, 520 S.E.2d 517 (1999) (evaluating misappropriation of corporate opportunity only after concluding claims was allowable as direct action where plaintiff had been uniquely harmed).

fair and Deceptive Trade Practices Act, O.C.G.A. § 10–1–372. That statute provides protection to a trade name when another's use of the same or similar name "causes a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services." *Eckles v. Atlanta Tech. Group*, 267 Ga. 801, 802, 485 S.E.2d 22 (1997). According to Defendants, Plaintiffs have not produced evidence showing: any goods or services provided by Defendants; any confusion as to their origin; or any trade name that was infringed upon.

In response, Plaintiffs argue that the statute also prohibits "any other conduct which similarly creates a likelihood of confusion or misunderstanding." O.C.G.A. § 10–1–372(12). Yet Plaintiffs nevertheless fail to cite any authority showing how the statute applies in this context, and they furthermore cite absolutely no evidence supporting their claim. Once again, this is insufficient at the summary judgment stage. Defendants' Motion for Summary Judgment is therefore GRANTED as to Cause of Action VI.

### 6. Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, and Tortious Interference with Contract Claims

In Cause of Action VII, Plaintiffs allege that Defendants committed breach of contract, breach of their duties of good faith and fair dealing, and tortious interference with contract. Defendants have moved for summary judgment on this Cause of Action.

#### a. Breach of contract

Plaintiffs allege a claim for breach of contract against Windley, HFI, and HHI.

The contract at issue for these claims is the original 1992 Securities Purchase Agreement between Plaintiffs and HFI. (Defs.' Ex. CC.) Defendants contend that they are entitled to summary judgment because: (1) Windley and HHI are not parties to the contract; (2) there was no breach; and (3) Plaintiffs were not harmed by any alleged breach. Defendants note that even if there was a breach, moreover, Plaintiffs' long acquiescence in the claimed breaches estops them from now bringing this contract claim.

Plaintiffs respond that HHI is a party to the contract, because it succeeded to the obligations of HFI in the Merger Agreement. (Defs.' Ex. 9.) Although Plaintiffs fail to identify a provision in the Merger Agreement whereby HHI assumed HFI's obligations, and they cite no authority for this interpretation, Defendants offer no reply. The fifth paragraph on DS 06560 of Defendants' Exhibit 9 appears to convert the rights associated with HFI shares into the rights associated with HHI shares. *See Atlanta Dev., Inc. v. Emerald Capital Invs., LLC*, 258 Ga.App. 472, 574 S.E.2d 585, 589 (2002) (if the terms of the contract are clear and unambiguous, the Court will enforce the contract according to its terms). As a matter of law, therefore, although HHI was not a party to the 1992 Securities Agreements, it did assume the obligations of HFI under the plain language of the Merger Agreement.

As for Windley, Plaintiffs argue that he was the "real party in interest in the contract." [39] (Pls.' Resp. to Defs.' Mot. for Summ. J. at 61.) Plaintiffs rely on *Parks v. Multimedia Technologies*, 239 Ga.App.

---

**39.** Plaintiffs contend that Windley was a party to the contract, but the evidence they cite does not support this proposition. (*See* Pls.' Resp. & Opp'n to Defs' Statement of Undisputed Material Facts ¶ 3.) Windley signed the Agreement in his capacity as President of HFI, but he was not individually a party to the contract.

282, 292, 520 S.E.2d 517 (1999) for the proposition that a corporate officer may be liable for interfering with a contract of a corporation. *Parks* is inapposite here because it deals with tortious interference with a contract, not breach of a contract by an individual not a party to the contract. Here, it is undisputed that Windley is not a party to the Securities Agreement. Thus, Plaintiffs' breach of contract claim against him cannot lie. *See First Nat'l Bank & Trust in Macon v. Roberts*, 187 Ga. 472, 472, 1 S.E.2d 12 (1939) (action on a contract must be brought against the person who made it).

As to Plaintiffs' claims against HFI and HHI, they identify as a breach the alleged failure of HFI and HHI to regularly provide monthly, quarterly, and yearly income statements of HFI. The Shareholders' Agreement requires certain reporting:

> (i) ... not more than 45 days after the end of each month, a consolidated balance sheet ... for such month;

> (ii) ... not more than 45 days after then end of each fiscal quarter ..., a consolidated balance sheet ... for such fiscal quarter;

> (iii) Not more than 90 days after the end of each fiscal year ... a consolidated balance sheet ... for such year;

> (iv) ... such other reports, documents and records as the Purchaser or ADTF may reasonably request with respect to the Company's financial condition; and

> (v) Not later than November 30 of each fiscal year a draft of the Company's annual budget and financial plan, for approval by the Company's board of directors prior to December 31 of each such fiscal year.

(Defs.' Ex. 3 § 5A.) Subparagraphs (i) through (iii) require that the reports be prepared in accordance with generally accepted accounting principles consistently applied. (*See id.*)

Specifically, Plaintiffs point to two alleged breaches: (1) Defendants' failure to provide Plaintiffs with accurate financial information about unpaid payroll taxes until long after the delinquency; and (2) Defendants' failure to provide Plaintiffs with any information about the $500,000 of HHI funds wired to Windley and used for the foreclosure bid.

As to the unpaid payroll taxes, Plaintiffs have cited to no evidence of missing or inaccurate financial statements. They have thus failed to meet their summary judgment burden of showing material issues of fact whether a breach in fact occurred. Furthermore, they have failed to show that they were harmed by this alleged breach. It is undisputed that all payroll taxes have been paid by FSI or HHI. Plaintiffs contend that they were harmed because, as directors of HHI, they were personally liable for any unpaid payroll taxes. (*See* Defs.' Ex. 45 (March 13, 2001 memorandum from Windley to Emont and Jenkins) ("[t]here is continuing personal liability associated with taxes until they are paid").) This argument must fail first because the individuals who would have been personally liable are not parties to this case, and second, because any potential liability has been mooted by the ultimate payment of the taxes. *See Block v. City of W. Palm Beach*, 112 F.2d 949, 952 (5th Cir.1940) ("it is elementary that the mere breach of an agreement which causes no loss to plaintiff will not sustain a suit by him for damages").

Turning to the failure to report the $500,000 payment to Windley, this argument must also fail. First, the contract provisions to which Plaintiffs point require reporting forty-five days after each month. It is uncontroverted that the payment was made in early March 2001. Any report

containing this payment would have come well after the foreclosure, sometime in April 2001. Thus, even if there was ultimately a breach in April 2001,[40] Plaintiffs have failed to show evidence of harm from such a breach. Accordingly, the breach of contract claims set forth on Cause of Action VII of the Complaint must fail.

### b. Breach of covenant of good faith and fair dealing

▮ Defendants contend that this theory must fail because under Georgia law, it is strictly derivative of a breach of contract claim and cannot be maintained independently. Plaintiffs do not respond to this argument but simply contend that "[b]ecause there was a breach of contract," "there could be a breach of the implied covenant." (Pls.' Resp. to Defs.' Mot. for Summ. J. at 63.) This showing is insufficient.

Under Georgia law, "the 'covenant' is not an independent contract term." *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429 (11th Cir.1990). In *Alan's of Atlanta*, the Eleventh Circuit confronted a case in which the plaintiff had not alleged a breach of any specific contract provisions but sought to bring a claim for breach of the covenant of good faith and fair dealing. *Id.* at 1429. The court rejected this claim, explaining that the "covenant" "is a doctrine that modifies the meaning of all explicit terms in a contact, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure.*" *Id.*

Here, the Court has found no genuine issue of material fact as to whether the contract provisions on which Plaintiffs rely were breached at all, and even if they were, whether there was any harm. Plaintiffs attempt to invoke the implied covenant of good faith and fair dealing as a separate doctrine upon which they can recover; this they cannot do. Accordingly, Plaintiffs' implied covenant of good faith and fair dealing claims must fail.

### c. Tortious interference with contract claims against FSHI and FSHLLC

▮ Defendants are also entitled to summary judgment with respect to Plaintiffs' tortious interference claims. To prevail on a claim of tortious interference with contract, a plaintiff must show: (1) improper action or wrongful conduct by a defendant without privilege; (2) purposeful or malicious action with intent to injure by the defendant; (3) the defendant induced a breach of contractual obligations; and (4) the tortious conduct proximately caused the plaintiff's injuries. *Disaster Servs., Inc. v. ERC P'ship*, 228 Ga.App. 739, 740, 492 S.E.2d 526 (1997). Where there is no breach of a contract, this claim will not lie.[41] *See Jerry Dickerson Presents, Inc. v. Concert/S. Chastain Promotions*, 260 Ga.App. 316, 328, 579 S.E.2d 761 (2003) (upholding grant of summary judgment on tortious interference with contract claim where the contract had been performed according to its terms). As described above, Plaintiffs point to only two potential breaches of the Securities Agreement's financial reporting requirements. But Plaintiffs have failed to produce evidence showing any genuine issues of material

---

**40.** Plaintiffs have pointed to no evidence of a breach for failing to report in April 2001, after the foreclosure. Instead, they focus on the "nondisclosure of financial information about 2001 through at least the foreclosure sale." (Pls.' Resp. to Defs.' Mot. for Summ. J. at 63.) In light of Defendants' showing of a lack of evidence to support this claim, Plain-

tiffs have failed to meet their corresponding summary judgment burden.

**41.** The Court notes that Plaintiffs have not brought a claim for tortious interference with business relations, and so the Court confines its analysis to contractual relations.

fact with respect to whether such breaches in fact occurred. Moreover, although Plaintiffs provide a list of grievances against FSHI and FSHLLC, Plaintiffs fail to explain how the complained-of actions induced any failure of HFH to comply with the reporting terms of the Securities Agreement. As a matter of law, therefore, Plaintiffs cannot meet at least the third element of tortious interference with contractual relations and this claim must fail.

### 7. Unjust Enrichment, Constructive Trust, and Accounting

 Plaintiffs assert a claim for unjust enrichment against Defendants and seek an accounting and a resulting or constructive trust. (Compl.¶ 140.) "Unjust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract ..., but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefited party equitably ought to return or compensate for." *St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 137, 508 S.E.2d 646 (1998). "[A] constructive trust is a remedy created by a court in equity to prevent unjust enrichment." *Id.* at 138, 508 S.E.2d 646. It is not an independent cause of action. *Id.*

 Defendants contend that there is an absence of evidence that Plaintiffs conferred any benefit on Defendants. Plaintiffs respond that unjust enrichment may occur not just where benefits are conferred, but where benefits are taken. This assertion is correct. *See id.* at 137–38, 508 S.E.2d 646 (describing unjust enrichment claim based on an employee's embezzlement). Here, Plaintiffs have provided evidence of at least one benefit obtained—the $500,000 of company money used to finance the bid. Defendants provide no other basis for granting summary judgment on this claim. Thus, Plaintiffs' unjust enrichment claim may proceed.

Although a jury must decide Plaintiffs' unjust enrichment claim, a constructive trust seems to be a remedy that might be more properly awarded for the benefit of *all* shareholders as a result of a successful derivative action. *See Fricker v. Americus Mfg. & Imp. Co.*, 124 Ga. 165, 52 S.E. 65, 69 (1905) (imposing implied trust as remedy for breach of fiduciary duty). Neither party has considered this issue, and the Court need not reach it at this time. For purposes of the pending motion for summary judgment, the Court GRANTS Defendants' Motion as to the constructive trust claim because a constructive trust is a remedy, not a cause of action. In doing so, the Court does not intend to foreclose any appropriate remedy should Plaintiffs prevail at trial. However, should Plaintiffs wish to pursue this remedy, the Court will expect the parties to present argument as to whether it is an appropriate remedy in this case.

 Next, the Court concludes that Plaintiffs' claim for an accounting may not proceed. Such a claim "is not warranted if the accounts are not unusually complicated and an adequate remedy is available at law." *Faircloth v. A.L. Williams & Assocs., Inc.*, 219 Ga.App. 560, 560, 465 S.E.2d 722 (1995). Where extensive discovery is available, these conditions are met and a grant of summary judgment is proper. *See id.* (so reasoning). Here, Plaintiffs have failed to provide evidence that an accounting is necessary, stating only that it is an alternative to their damages claim. This showing is insufficient on a motion for summary judgment. Moreover, Plaintiffs had an extensive discovery period within which they could have determined amounts allegedly due.

Finally, it is unclear whether Plaintiffs intend their request in Cause of Action VIII for declaratory judgment is meant to stand alone or in conjunction with the

other forms of relief requested. Neither party has submitted any argument with regard to declaratory relief; because Defendants have failed to meet their initial summary judgment burden on this issue, the Court denies summary judgment to Defendants to the extent declaratory relief is sought independently of the other claims.

Based on the foregoing, Defendants' Motion for Summary Judgment is hereby **GRANTED in part** and **DENIED in part** as to Cause of Action VIII.

## C. Motion for Summary Judgment on FSHI's Counterclaim

In its counterclaim, FSHI alleges that Plaintiffs committed tortious interference with business relations and prospective business relations. (Countercl. Count I[22], at 6.) Plaintiffs filed this lawsuit's predecessor on October 5, 2001. They dismissed the suit without prejudice in late October and refiled this suit thereafter, on November 21, 2001.[42] FSHI contends that Plaintiffs filed these suits in order to prevent FSHI from obtaining new investments or financing. APA Excelsior III has moved for summary judgment, arguing that the Counterclaim cannot survive as a matter of law because it is based on

the bringing of a nonfrivolous lawsuit. The Court agrees.[43]

■ In Georgia, tortious interference claims cannot be predicated upon the allegedly improper filing of a lawsuit. *Phillips v. MacDougald*, 219 Ga.App. 152, 155, 464 S.E.2d 390 (1995) (discussing tortious interference with contractual relations);[44] *see Britt Paulk Ins. Agency, Inc. v. Vandroff Ins. Agency, Inc.*, 952 F.Supp. 1575, (N.D.Ga.1996) (except for presence of contract, tortious interference with business relations requires nearly the same elements as tortious interference with contract). FSHI's counterclaim is predicated upon the bringing of this lawsuit and its precursor. It therefore cannot survive as a matter of law. Accordingly, Plaintiff APA Excelsior III's Motion for Summary Judgment on Counterclaim [84–1] is hereby **GRANTED**.

## Conclusion

Defendants's Motion for Oral Argument [81–2] is hereby **DENIED**. Defendants' Motion for Summary Judgment [81–1] is hereby **GRANTED in part** as to: (1) Cause of Action I against Healthfield, Inc., Four Seasons Healthcare, Inc., and Four Seasons Healthcare, LLC; (2) Cause of Action I as to Healthfield Holdings, Inc.,

---

**42.** Apparently, the parties unsuccessfully attempted to reach a settlement between October 5 and November 21, 2001.

**43.** The Court declines FSHI's invitation to view its counterclaim for tortious interference as a counterclaim for common law malicious abuse of process should the Court find the tortious interference theory unavailing. (FSHI's Opp'n to Pl. APA Excelsior III, L.P.'s Mot. for Summ. J. on Countercl. at 16 n. 10.) FSHI must move for leave to amend and meet the applicable standards for doing so, neither of which it has attempted to do. *See Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir.1999) (discussing scope of district court's discretion in considering motions for leave to amend). The Court also notes that there is some authority that Rule 11–not a

common law cause of action-provides the vehicle in federal courts for redressing abuse of process. *Union Carbide Corp. v. Tarancon Corp.*, 682 F.Supp. 535, 545–46 (N.D.Ga. 1988); *see Great W. Bank v. Southeastern Bank*, 234 Ga.App. 420, 420–24, 507 S.E.2d 191 (1998) (discussing principles). *But see East–Bibb Twiggs Neighborhood Ass'n v. Macon Bibb Planning & Zoning Comm'n*, 888 F.2d 1576, 1578 n. 2 (11th Cir.1989) (recognizing disagreement).

**44.** Although *Phillips* based much of its reasoning on the availability of the state action of abuse of process, the Court finds the same reasoning applicable here where Rule 11 serves to counter the abusive filing of lawsuits. *See supra* n. 43.

but only with respect to § 20(a) controlling person liability; (3) Cause of Action II, but only with respect to the claims against Four Seasons, Inc. and Four Seasons Healthcare, LLC under O.C.G.A. § 23–2–53; (4) Cause of Action III; (5) Cause of Action IV; (6) Cause of Action V; (7) Cause of Action VI; (8) Cause of Action VII; and (9) Cause of Action VIII as to the constructive trust and accounting claims.

Defendants' Motion for Summary Judgment [81–1] is hereby **DENIED in part** as to: (1) Cause of Action I against Windley; (2) Cause of Action I against Healthfield Holdings, Inc. as to the § 10b and Rule 10b–5 claims; (3) Cause of Action II against all Defendants, except for the claim against Four Seasons, Inc. and Four Seasons Healthcare, LLC under O.C.G.A. § 23–2–53; and (4) Cause of Action VIII as to the unjust enrichment claim and declaratory judgment claims.

Plaintiff APA's Motion for Summary Judgment on Counterclaim [84–1] is hereby **GRANTED**; Plaintiff Humana's Motion for Summary Judgment on Federal Securities Claim [85–1] is hereby **DENIED**; and Plaintiff Fostin Capital's Motion for Summary Judgment on Non–Securities Claims [89–1] is hereby **DENIED**. Defendant's Motion to Strike and to Disregard and Exclude Unauthenticated Documents [116–1] is hereby **DENIED**. Defendant's Motion to Disregard and Exclude Certain Inadmissible Documents [121–2] is hereby **DENIED without prejudice**. Plaintiffs' Motion to Enforce July 22 Order [138–1] and Plaintiffs' Motion for Permission to Name Expert Witnesses [138–2] are hereby **DENIED**.

In summary, the following claims remain for trial: (1) Cause of Action I against Windley; (2) Cause of Action I against Healthfield Holdings, Inc. as to the § 10b and Rule 10b–5 claims; (3) Cause of Ac-

tion II against all Defendants, except for the claim against Four Seasons, Inc. and Four Seasons Healthcare, LLC under O.C.G.A. § 23–2–53; and (4) Cause of Action VIII as to the unjust enrichment claim and declaratory judgment claims. Because the viability of Cause of Action I depends on the application of the forced seller doctrine, the parties should be prepared to present arguments and evidence on that issue at the pre-trial conference. The parties are **ORDERED** to submit a proposed consolidated pre-trial order within 30 days of the entry of this Order. *See* N.D. Ga. Local R. 16.4. This case shall be placed on the next trial calendar thereafter.